# EXHIBIT A-1

# HOSPITAL SERVICES AGREEMENT

BETWEEN

CARE 1ST HEALTH PLAN

AND

CATHOLIC HEALTHCARE WEST

dba

ST. VINCENT MEDICAL CENTER

THIS AGREEMENT IS SUBJECT TO THE APPROVAL

OF THE CALIFORNIA DEPARTMENT OF CORPORATIONS

AND THE DEPARTMENT OF HEALTH SERVICES



# CARE 1ST HEALTH PLAN

## HOSPITAL SERVICES AGREEMENT

## TABLE OF CONTENTS

RECITALS ..... 1

AGREEMENT ..... 1

I. DEFINITIONS ..... 1

II. PLAN RESPONSIBILITIES ..... 4

III. HOSPITAL RESPONSIBILITIES ..... 5

IV. COMPENSATION ..... 7

V. UTILIZATION AND QUALITY MANAGEMENT PROGRAM ..... 8

VI. TERM AND TERMINATION OF AGREEMENT ..... 9

VII. REGULATORY COMPLIANCE ..... 9

VIII. ACCESS TO AND CONFIDENTIALITY OF MEDICAL RECORDS ..... 11

IX. RELATIONSHIP OF THE PARTIES ..... 11

X. LIABILITY, INDEMNITY AND INSURANCE ..... 12

XI. PLAN MEMBER COMPLAINTS AND DISPUTES ..... 12

XII. DISPUTE RESOLUTION ..... 13

XIII. UNFORESEEN CIRCUMSTANCES ..... 13

XIV. GENERAL PROVISIONS ..... 13

ATTACHMENT A COVERED HOSPITAL SERVICES ..... 16

ATTACHMENT B COMPENSATION - MEDI-CAL MEMBERS ..... 17

ATTACHMENT B-1 HEALTHY FAMILIES PROGRAM CO-PAYMENTS ..... 19

ATTACHMENT B-2 COMPENSATION - HEALTHY FAMILIES MEMBERS ..... 20

ATTACHMENT C PROFESSIONAL LIABILITY INSURANCE COVERAGE FORM ..... 22

ATTACHMENT D DISCLOSURE FORM ..... 23

ATTACHMENT E LOCAL INITIATIVE MANDATORY SUBCONTRACT PROVISIONS ..... 24

CARE 1ST HEALTH PLAN
HOSPITAL SERVICES AGREEMENT

This *Hospital Services Agreement* ("Agreement") is entered into between Care 1st Health Plan ("Plan"), a California corporation, and Catholic HealthCare West, Southern California, a California not for profit, public benefit corporation, dba St. Vincent Medical Center ("Hospital"), to be effective from January 1, 2001.

RECITALS

A. WHEREAS, Plan is licensed to operate a health care service plan under and subject to the requirements of the Knox-Keene Health Care Service Plan Act of 1975, as amended (the "Act"), and the rules promulgated thereunder ("DOC Regulations");

B. WHEREAS, Plan has entered into a Service Agreement with LA Care Health Plan, the Local Initiative Health Authority for Los Angeles County ("Local Initiative" or "LA Care") to provide or arrange for certain health care services to Plan Medi-Cal Members, under LA Care's contract with the California Department of Health Services ("DHS") under and subject to the Welfare and Institutions Code, as amended;

C. WHEREAS, Plan has also entered into (a) a contract with the Managed Risk Medical Insurance Board ("MRMIB"), under and subject to the California Insurance Code, as amended ("Insurance Code"), and the regulations promulgated thereunder ("HFP Regulations"), and (b) a Global Services Agreement with LA Care, to provide or arrange for the provision of certain health care services to Plan Healthy Families Program ("HFP") Members, directly and as a Local Initiative Partner, respectively;

D. WHEREAS, Plan desires to enter into contracts with licensed and experienced Health Care Professionals, hospitals and other providers to provide or arrange for the provision of certain health care services to Plan Members;

E. WHEREAS, Hospital is licensed and experienced to provide or arrange for the provision of certain hospital and other services and supplies, and

F. WHEREAS, Plan and Hospital desire to enter into this Agreement for Hospital to provide or arrange for the provision of certain hospital and other services and supplies to Plan Medi-Cal Members and/or Plan HFP Members (collectively referred to as "Plan Members").

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually agree as follows:

I.
DEFINITIONS

The following terms shall have the following meanings for purposes of this Agreement:

1.1 "Active Labor" means a labor at a time at which either of the following would occur: (1) There is inadequate time to effect safe transfer to another hospital prior to delivery. (2) A transfer may pose a threat to the health and safety of the patient or the unborn child.

1.2 "Acts and Regulations" means the Federal and California codes and regulations that govern the services to be provided under this Agreement which are more fully described in Article VII.

1.3 "Ancillary Services" means those Covered Health Care Services necessary to the diagnosis and treatment of Plan Members, including, but not limited to, ambulance, ambulatory or day surgery, durable medical

equipment, imaging services, laboratory, pharmacy, physical or occupational therapy, Emergency Services and other services customarily deemed ancillary.

1.4 "Attachment(s)" means the attachments, numbered A through E to this Agreement which are incorporated herein as if set forth in full.

1.5 "Authorization" or "Authorized" means the approval by Plan for a Plan Member to be referred to a specialist physician, to be hospitalized in a hospital or a skilled nursing facility, to be prescribed pharmaceuticals not included in the Plan's drug formulary, or for covered ancillary services including durable medical equipment, home health hospital services, ambulatory surgery facility, and medical transportation services.

1.6 "Benefits Agreement(s)" or "Plan Contract(s)" mean(s) the written agreement(s) between Plan and DHS, Plan and the Local Initiative, and Plan and the California Managed Risk Medical Insurance Board, which provides coverage for Covered Health Care Services to be provided to Plan Members.

1.7 "California Children's Services (CCS)" means the state medical program that treats children with certain physically handicapping conditions and who need specialized medical care.

1.8 "CCS Paneled Provider" means a physician, hospital or other Health Professional certified by the CCS as qualified and competent to provide medical services to CCS eligible children for CCS conditions.

1.9 "Co-payment" means the cost payable by or on behalf of a Plan HFP Member at the time certain Covered Health Care Services are rendered. Co-payments are a specific dollar amount established by the Managed Risk Medical Insurance Board ("MRMIB") in accordance with state law. Co-payment amounts for Covered Health Care Services to Plan HFP Members are set forth in Attachment B-1.

1.10 "Covered Health Care Services" means those health care services and supplies covered under a Benefits Agreement/Plan Contract. Covered Health Care Services for Plan Medi-Cal Members and Plan HFP Members may differ and are listed in detail in Attachment B. Covered Health Care Services includes Covered Hospital Services.

1.11 "Covered Hospital Services" means those Covered Health Care Services which Hospital shall provide or arrange for the provision of to Plan Members, within the scope of its licensure, and which are described in Attachment A.

1.12 "DHS" means the California Department of Health Services.

1.13 "DOC" means the California Department of Corporations or the California department of Managed Health care (DMHC), the successor agency to DOC, regulating health care service plans in California.

1.14 "Emergency Medical Condition" means a medical condition manifesting itself by the sudden onset of symptoms of acute severity, which may include severe pain, such that a reasonable person would expect that the absence of immediate medical attention could result in (1) placing the member's health in serious jeopardy, (2) serious impairment to bodily functions, or (3) serious dysfunction of any bodily organ or part.

1.15 "Emergency Services and Care" means medical screening, examination, and evaluation by a physician, or, to the extent permitted by applicable law, by other appropriate personnel under the supervision of a physician, to determine if an Emergency Medical Condition or Active Labor exists and, if it does, the care, treatment, and surgery by a physician necessary to relieve or eliminate the Emergency Medical Condition, within the capability of the facility. It also means an additional screening, examination, and evaluation by a physician, or other personnel to the extent permitted by applicable law and within the scope of their licensure and clinical privileges, to determine if a psychiatric Emergency Medical Condition exists, and the care and treatment necessary to relieve or eliminate the psychiatric Emergency Medical Condition, within the capability of the facility.

1.16   "Health Professional" means any nurse/physician extender (e.g., nurse practitioner, physician assistant) and other allied health professional, including but not limited to a health educator, dietician, laboratory technologist, audiologist, speech pathologist, psychologist, podiatrist, dentist, chiropractor, physical therapist, occupational therapist, clinical social worker, marriage, family and child counselor, optometrist or dispensing optician, who is licensed by the State of California and who provides certain Covered Health Care Services to Plan Members through an agreement with Plan.

1.17   "Healthy Families Program (HFP)" means the federal and state funded program administered by the Managed Risk Medical Insurance Board ("MRMIB") to make available health, dental and vision coverage for children with family incomes above the level eligible for no-cost Medi-Cal and below 250 percent of the federal poverty level, and without access to affordable employer based coverage. The percentage stated above may be changed by federal and state laws and regulations.

1.18   "Local Initiative" means L. A. Care Health Plan, the duly constituted government agency that is Los Angeles County's locally created health care service plan.

1.19   "Medi-Cal" means the federal and state funded health care program established by Title XIX of the Social Security Act, as amended administered in California by DHS.

1.20   "Medically Necessary" means those Covered Health Care Services which are:

   a) Provided for the diagnosis or the direct care or treatment of a medical condition, illness or injury;

   b) Appropriate for the symptoms, consistent with diagnosis, and otherwise in accordance with generally accepted medical practice and professionally recognized standards;

   c) Not furnished primarily for the convenience of the Plan Member, the attending physician or other provider of services; and

   d) Performed at the most appropriate level that would provide safe and effective care for the Plan Member's medical condition. When applied to hospitalization, this means that the Plan Member requires acute care due to the nature of the services rendered or the Plan Member's condition, and that the Plan Member cannot receive safe and adequate care as an outpatient or at a lower level of care.

1.21   "MRMIB" means the California Managed Risk Medical Insurance Board, the state agency for administration of the Healthy Families Program.

1.22   "Plan Hospital" means any institution licensed by DHS, which is accredited by the Joint Commission on the Accreditation of Healthcare Organizations (JCAHO) and certified for participation under Medicare and Medicaid (Medi-Cal) as an acute care hospital that provides certain Covered Health Care Services to Plan Members through an agreement with Plan.

1.23   "Plan Member" means a person certified as eligible for coverage under a Benefits Agreement/Plan Contract who has enrolled in Plan, and includes a Plan Medi-Cal Member and a Plan HFP Member.

1.24   "Plan Medi-Cal Member" means a person, certified as eligible for Medi-Cal coverage under a Benefits Agreement/Plan Contract for Medi-Cal Covered Health Care Services, who has enrolled in Plan.

1.25   "Plan HFP Member" means a person, certified as eligible for HFP coverage under a Benefits Agreement/Plan Contract for HFP Covered Health Care Services, who has enrolled in Plan.

1.26   "Plan Physician" means a physician duly licensed to practice medicine or osteopathy in accordance with applicable California law who has entered into an agreement with Plan, or a Plan Provider, to provide Primary Care Services to Plan Members.

1.27 "Plan Providers" means the physicians, Medical Groups, Independent Practice Associations (IPAs), hospitals, skilled nursing facilities, home health agencies, pharmacies, ambulance companies, laboratories, X-ray facilities, durable medical equipment suppliers and other licensed health care entities or professionals which or who provide Covered Health Care Services to Plan Members through an agreement with Plan, or another Plan Provider.

1.28 "Primary Care Physician" or "PCP" means a Plan Physician, chosen by or for a Plan Member, who is primarily responsible for providing initial care to the Plan Member, for maintaining the continuity of the Plan Member's care, for providing Primary Care Services and for initiating referrals for other Covered Health Care Services for the Plan Member. PCPs include general and family practitioners, internists, pediatricians, and primary care obstetricians/gynecologists.

1.29 "Provider Services Manual" means documentation of the Plan's Quality Management and Utilization Management Programs, the Combined Evidence of Coverage and Disclosure Forms, Plan Member Grievance Policy and Procedures, Encounter Data Reporting Requirements, and Disenrollment Procedures, as amended by Plan from time to time.

1.30 "Quality Management Program" means Plan's program designed to (1) assure the provision of quality Covered Health Care Services to Plan Members, (2) document that quality of care provided is being reviewed, and (3) ensure that problems are identified, and effective corrective action is implemented and followed up.

1.31 "Service Area" means the geographical area comprised of those areas designated by the U.S. Postal Service Zip Codes that have been approved by DHS or MRMIB, and DOC.

1.32 "Utilization Management Program" means Plan's program designed to review and manage the utilization of Covered Health Care Services provided to Plan Members.

## II.
## PLAN RESPONSIBILITIES

2.1 Plan shall perform the administrative, operations, enrollment, Plan Member services, marketing, Quality Management, Utilization Management, regulatory compliance and reporting functions appropriate and necessary for the administration of Plan and this Agreement.

2.2 Plan shall ensure that each Plan Member selects or is assigned to a Plan Medical Group and/or to a Primary Care Physician to provide and make available Covered Health Care Services to the Plan Member.

2.3 Plan shall provide or arrange for identification cards or other materials for Plan Members, to enable Hospital to identify Plan Members who are eligible to receive Covered Hospital Services from or through Hospital, and shall verify Plan Member eligibility and the Covered Hospital Services the Plan Member is Authorized to receive, upon request from Hospital.

2.4 Plan shall compensate Hospital for Covered Hospital Services provided to Plan Members under the Agreement as fully described in Article IV below.

2.5 Plan shall monitor the quality of health care provided to Plan Members in accordance with the Plan's Quality Management policies and procedures set forth in the Provider Services Manual and all applicable legal requirements.

2.6 Plan shall establish a Public Policy Advisory Committee through which Plan Members may participate in establishing the public policy of Plan to assure the comfort, dignity, and convenience of Plan Members.

III.
HOSPITAL RESPONSIBILITIES

3.1 Hospital shall provide or arrange for the provision of Covered Hospital Services described in Attachment A, and within the scope of its licensure, to Plan Members.

3.2 Hospital shall provide or arrange for the staff, personnel, equipment and facilities necessary for Plan Members to obtain Covered Hospital Services from Hospital. Such Covered Hospital Services shall be available and accessible on a twenty-four (24) hours a day, seven (7) days a week basis.

3.3 Hospital shall make available hospital Emergency Services and Care twenty-four (24) hours a day/seven (7) days a week. Hospital shall provide such hospital Emergency Services and Care when Medically Necessary and shall not be required to obtain prior Authorization for such Emergency Services. Hospital shall notify Plan no later than the following business day after a Plan Member receives such hospital Emergency Services and Care from Hospital..

3.4 Hospital shall establish policies and procedures for the furnishing of drugs under emergency circumstances. Hospital emergency room shall provide, when the course of treatment of a Plan Member under emergency circumstances requires the use of drugs, a sufficient quantity of such drugs to last until the Plan member can reasonably be expected to have a prescription filled at a Plan network pharmacy.

3.5 Hospital shall comply with all Plan policies and procedures set forth in the Provider Services Manual, and with all applicable state and federal laws and regulations relating to the delivery of Covered Hospital Services.

3.6 Hospital agrees to obtain written Authorization, in accordance with Plan's policies and procedures, prior to admission of a Plan Member to Hospital, and prior to providing Covered Hospital Services to a Plan Member, except for an admission or Covered Hospital Services rendered in connection with the rendering of Emergency Services and Care. The Hospital shall obtain approval for emergency admissions on the day after admission or when the day of admission is not a business day, the first business day thereafter. Failure to notify the Plan in a timely manner may result in a denial as outlined in Title 22, Section 51327.

3.7 Hospital shall provide or arrange for the provision of Covered Hospital Services to Plan Members in the same manner and in accordance with the same standards of care and other standards, skill and diligence, and with the same time availability as it provides or arranges for the provision of hospital and other services and supplies to all other patients of Hospital.

3.8 Hospital shall not discriminate against any Plan Member on the basis of race, color, national origin, ancestry, religion, sex, marital status, sexual orientation, mental or physical impairment, genetic characteristics or age.

3.9 Except in an Emergency, or if no other Plan Provider is available, or the Plan Member's condition requires treatment elsewhere, Hospital shall refer Plan Members only to other Plan Providers for Covered Hospital Services and other Covered Health Care Services.

3.10 If Hospital is paneled by California Children's Services (CCS) to provide services for CCS eligible beneficiaries, Hospital agrees to submit referrals for members eligible to CCS within the timeframes specified by CCS and the Plan.

3.11 Hospital understands and agrees that the Plan will not pay Hospital for benefits denied by CCS because the referral was not submitted to CCS by CCS Paneled Hospital in a timely manner or because a CCS service was provided by a non-CCS paneled provider. Hospital cannot seek additional payment or compensation from members for CCS covered services due to Hospital's failure to submit the application as specified herein.

3.12 If Hospital is not paneled by CCS to provide services required by a CCS eligible Member, Hospital shall transfer care of such Member to the nearest CCS Paneled Plan Provider hospital within the timeframes set by

CCS and/or Plan. If Hospital fails to transfer the member to a CCS Paneled Provider hospital as directed by the Plan and/or CCS, Plan shall not reimburse Hospital for any per diem and other charges incurred.

3.13 Hospital shall maintain all licenses required by law to operate its facilities, all certifications necessary for Hospital to participate in Medicare and Medicaid (Medi-Cal) programs, and accreditation by the Joint Commission on the Accreditation of Healthcare Organizations. Hospital agrees to notify Plan promptly in the event any action is taken against any such license, certification or accreditation.

3.14 Hospital shall cooperate and comply with the policies and procedures developed by Plan , the Local Initiative and MRMIB with respect to required referral and linkage systems for mental health, dental, California Children Services, family planning, Indian health services, and Department of Public Health services and any other community health or excluded services in accordance with the requirements of DHS. Hospital shall take such actions as necessary to ensure appropriate case management and continuity of care between Hospital and the local health departments or other agencies to which Plan Members may be referred.

3.15 If Hospital is contracted for maternity services, then Hospital shall have procedures in place to facilitate the initiation of breast feeding for Plan Members. Procedures are to include in-service training to labor and delivery medical and nursing staff regarding the initiation of breastfeeding by mothers after delivery.

3.16 Hospital agrees to cooperate with and abide by the claims processing, Authorization, Utilization Management, Quality Management, appeal, peer review and audit policies and procedures of Plan and the Local Initiative as approved by DHS and DOC, and to comply with all final determinations rendered pursuant to such policies and procedures. Hospital may appeal adverse determinations in accordance with the procedures established by Plan.

3.17 Hospital shall not ask Plan to terminate a Plan Member or transfer a Plan Member to another Plan Provider because of the Plan Member's medical condition.

3.18 Hospital acknowledges and agrees to comply with all performance standards, policies and procedures as may be adopted or amended from time to time by the Local Initiative, in accordance with the Benefits Agreement, or as may be required by DOC or DHS. In the event the Local Initiative finds Hospital non-compliant with the Local Initiative, DHS or DOC performance standards, the Local Initiative shall have the power and authority to impose sanctions upon Hospital in accordance with, and subject to all appeal rights under, the Local Initiative sanctions policies and procedures as implemented from time to time by the Local Initiative.

3.19 Hospital shall participate in and comply with the performance standards, policies, procedures, and programs established from time to time by the Local Initiative, MRMIB and Plan with respect to cultural and linguistic services, including without limitation, attending training programs, and collecting and furnishing cultural and linguistic data to the Local Initiative, MRMIB and Plan.

3.20 Upon request by the Plan, Hospital shall promptly provide Plan with such financial, capacity, encounter data or other information, reports, documents or forms as may be required to enable Plan to fulfill its reporting and other obligations under the Benefits Agreement or as otherwise required for purposes of compliance with the Acts and Regulations or the Medi-Cal Agreement between the Local Initiative and DHS.

3.21 Hospital shall ensure that the Health Professionals employed by or under contract with Hospital shall be appropriately licensed to provide health care services in the State of California, shall have met and continue to meet all applicable state laws, regulations and Plan standards of care, and shall submit evidence of such licensure to Plan upon request. Hospital agrees to notify Plan promptly in the event any action is taken against any such license, certification or accreditation.

3.22 Hospital agrees to cooperate to the fullest extent possible in granting Hospital medical staff privileges to Plan Physicians; provided however, that nothing shall prevent Hospital from requiring that such Plan Physicians meet Hospital's credentialing standards and comply with such medical staff bylaws, rules and regulations, policies and procedures as may be adopted from time to time by Hospital and its medical staff. Hospital shall, from time to time, notify Plan of the names of such Plan Physicians to the extent permitted by its medical staff

policies and protocols and so long as the disclosures shall not compromise the confidentiality of the medical staff's records pursuant to California Evidence Code Section 1157 or other applicable laws. Hospital agrees to respond to periodic inquiries from Plan as to whether any Plan Physician retains any such privileges granted by Hospital's medical staff and shall, at Plan's request, provide Plan with evidence of medical malpractice insurance coverage for each of the Plan Physicians on its medical staff.

3.23 Hospital acknowledges and agrees that, under the Plan Contract, Local Initiative has the right to require Plan to suspend treatment of Plan Members by Hospital, to transfer Plan Members from Hospital or require Plan to terminate Hospital from the Local Initiative Medi-Cal Plan at any time, subject to such review or appeal right as may be provided pursuant to the Benefits Agreement/Plan Contract, as amended from time to time.

3.24 Hospital shall use its best efforts to maintain a cooperative working relationship to ensure smooth operation of the Local Initiative Medi-Cal Plan. The parties hereto shall, at any time before, at or after execution of this Agreement, sign and deliver (or cause others to do so) all such documents and instruments, and do or cause to be done all such acts and things, and provide or cause to be provided all such information and approvals as may be reasonably necessary to carry out the provisions of this Agreement.

3.25 Hospital shall abide by, and agrees to include the same in any subcontract between Hospital and any health care provider from which the Hospital obtains usual or frequently used health care services on behalf of Plan Members, the provisions in Exhibit 7 of the Benefits Agreement/Plan Contract between Plan and the Local Initiative, set forth in Attachment E of this Agreement.

3.26 Hospital agrees to abide by the compliance policies and applicable standards of conduct in the Anti-Fraud Plan established by Plan in compliance with Health & Safety Code, Section 1348, to the extent that they directly or indirectly bear upon the subject matter of this Agreement

## IV. COMPENSATION

4.1 As compensation for providing Covered Hospital Services to Plan Members, Plan shall pay Hospital the applicable amounts provided for in Attachment B and Attachment B-2, within the DHS and Local Initiative claims payment timeliness guidelines. Such amounts, together with applicable co-payments, if any, shall constitute payment in full to Hospital for Covered Hospital Services provided to Plan Members. All claims for Covered Hospital Services shall be submitted to Plan on UB-92 forms, within ninety (90) days of the rendering of Covered Hospital Services.

4.2 Hospital shall be responsible for collecting all applicable co-payments from Plan HFP Members and payments for non-Covered Hospital Services directly from Plan Members (or other payers, as applicable), and shall be entitled to retain any and all such sums in addition to the compensation provided for under this Agreement.

4.3 Hospital agrees to accept Plan compensation for Covered Hospital Services hereunder as payment in full. Hospital agrees that whether or not there is any unresolved dispute for payment, under no circumstances shall Hospital directly or indirectly make any charges or claims against any Plan Member for Covered Hospital Services. Hospital may bill a Plan Member for services that are not Covered Hospital Services provided that prior to the rendering of such services Hospital advises the Plan Member of the Plan Member's obligation therefor, and the Plan Member agrees in writing to be financially responsible for such services.

4.4 Hospital agrees that in no event, including but not limited to nonpayment by Plan, Plan's insolvency or Plan's breach of this Agreement, shall any Plan Member be liable for any sums owed by Plan, and Hospital shall not bill, charge, collect a deposit or other sum or seek compensation, remuneration or reimbursement from, or maintain any action at law or have any other recourse against, or make any surcharge upon, a Plan Member or other person acting on a Plan Member's behalf to collect sums owed by Plan. If Plan receives notice of any surcharge upon a Plan Member, it shall take appropriate action, including but not limited to terminating this Agreement and requiring that Hospital provide the Plan Member with an immediate refund of such surcharge.

4.5 Hospital agrees that it will make no claim for recovery of the value of Covered Services rendered to a Plan Member when such recovery would result from an action involving the tort liability of a third party or casualty liability insurance including Worker's Compensation awards and uninsured motorist's coverage. Hospital will identify and notify Plan of cases in which an action by the Plan Member involving the tort or Worker's Compensation liability of a third party could result in recovery by the Plan Member of funds to which DHS has lien rights under Article 3.5, Part 3, Division 9 of the Welfare and Institutions Code. Hospital shall refer such cases to Plan within five (5) days of discovery in order for Plan to fulfill its obligation to report such cases to DHS within ten (10) days of discovery.

4.6 The provisions set forth in this Article IV shall survive termination of this Agreement regardless of the cause giving rise to such termination and shall be construed for the benefit of Plan Members, and shall supersede any oral or written agreement to the contrary now existing or hereafter entered into between Hospital and any Plan Member or any person acting on his/her behalf.

## V.
## UTILIZATION AND QUALITY MANAGEMENT PROGRAM

5.1 Plan shall establish a Utilization Management program to review the medical necessity of Covered Hospital Services furnished by Hospital to Plan Members on an inpatient and outpatient basis. Such program will be established by Plan, in it s sole and absolute discretion. This program shall include all elements covered in Plan's Utilization Management manual, which may be amended from time to time by Plan in its sole and absolute discretion. Hospital shall comply with the concurrent review process by providing Plan with daily medical review information on inpatient hospital stays or as directed by Plan's Utilization Management Staff on the next scheduled review day in a timely manner. Hospital shall comply with and, subject to Hospital's rights of appeal, shall be bound by such Utilization Management program and if requested, shall serve on the Utilization Management Committee of such program, without compensation, in accordance with the procedures established by Plan. Failure to comply with requirements of the Utilization Management program may be deemed by Plan to be a material breach of this Agreement and may, at Plan's option, be grounds for termination of this Agreement. Hospital agrees that decisions of a Plan designated Utilization Management Committee may be used to deny Hospital payment hereunder for those Covered Hospital Services provided to a Plan Member which are determined not to be Medically Necessary or for which Hospital failed to receive prior written Authorization in accordance with Plan's Authorization Procedures. All documents and information received or obtained by Hospital during its activities pursuant to this Section shall be held confidential by Hospital during and after the term of this Agreement and shall not be disclosed to any person without the prior written consent of Plan.

5.2 Plan shall establish a Quality Management program to review the medical appropriateness and quality of Covered Hospital Services furnished by Hospital to Plan Members on an inpatient and outpatient basis. Such program shall include all elements covered in the Plan's Provider Services Manual, which may be amended from time to time by Plan in its sole and absolute discretion. Hospital shall comply with and, subject to Hospital's right of appeal, shall be bound by such Quality Management program. If requested, a Hospital representative shall serve on the Quality Management committee of such program, without compensation, in accordance with the procedures established by Plan. Failure to comply with the requirements of the Quality Management program may be deemed by Plan to be a material breach of this Agreement and may, at Plan's option, be grounds for termination of this Agreement. All documents and information received or obtained by Hospital during its activities pursuant to this Section shall be held confidential by Hospital during and after the term of this Agreement and shall not be disclosed to any person without the prior written consent of Plan.

5.3 Hospital shall cooperate and comply with and participate in the Quality Management and Utilization Management programs established by the Local Initiative and approved by DHS/MRMIB and DOC, as amended from time to time.

5.4 Hospital understands that the Local Initiative will place certain obligations upon Plan regarding the quality of care received by Plans Members, and in certain instances the Local Initiative shall have the right to oversee and review the quality of care administered to Plan Members. Hospital agrees to cooperate with the Local Initiative in its review of the quality care administered to Plan Members. Hospital shall cooperate and comply with, and

participate in, the quality assurance/improvement program established by the Local Initiative, and approved by DHS and DOC, as amended from time to time, and in the Local Initiative's monitoring and evaluation activities. If requested by the Local Initiative through Plan, Hospital shall serve on the Local Initiative's quality improvement subcommittee.

VI.
TERM AND TERMINATION OF AGREEMENT

6.1 The initial term of this Agreement shall commence on the date first set forth above and shall continue for a period of one (1) year. Thereafter, this Agreement shall be automatically renewed for successive one year terms, without necessity of notice or action by either party; provided, however, that this Agreement may be terminated as provided below and as otherwise expressly provided herein.

6.2 This Agreement may be terminated without cause by either party by giving the other party at least ninety (90) days prior written notice of such termination.

6.3 For cause termination may be effected for a material breach of this Agreement or default in the performance of any material provision herein, if such breach or default is not corrected to the reasonable satisfaction of the non-breaching/non-defaulting party within thirty (30) days of receipt of written notice from the non-breaching/non-defaulting party specifying the breach or default. Such notice shall clearly state the effective date of such termination.

6.4 Notwithstanding the above, this Agreement may be immediately terminated by Plan for cause in the event of any of the following circumstances:

(a) Hospital's license to provide Covered Hospital Services in the State of California is suspended or revoked; or

(b) Hospital fails to maintain professional liability coverage in at least the minimum amount specified in Section 10.3 of this Agreement; or

(c) Plan or the Local Initiative determines that the health, safety or welfare of Plan Members is jeopardized by Hospital continuing to provide Covered Hospital Services under this Agreement.

(d) The Benefits Agreement/Plan Contract is terminated.

6.5 In the event of termination of this Agreement, Hospital shall immediately make available to Plan and the Local Initiative, or its designated representative, at no charge, in a usable form, any or all records, whether medical or financial, related to Hospital's performance under this Agreement.

6.6 All terms and provisions of this Agreement shall remain in effect until the effective date of termination. After termination of this Agreement, Hospital shall continue to provide Covered Hospital Services to each Plan Member who is receiving Covered Hospital Services from Hospital on the effective date of termination of this Agreement, until the effective date of discharge or the transfer of such Plan Member to another hospital for further treatment. Hospital shall continue to provide Covered Hospital Services under such circumstances at the compensation rates then in effect under this Agreement.

6.7 Notwithstanding termination of this Agreement, Plan shall continue to have access to Hospital's records in accordance with the provisions of this Agreement, to the extent permitted by law and as necessary to fulfill the requirements of this Agreement and Plan's obligations under all applicable laws, rules and regulations.

VII.
REGULATORY COMPLIANCE

7.1 Plan is subject to the requirements of Chapter 2.2 of Division 2 of the California Health and Safety Code, Subchapter 5.5 of Chapter 3 of Title 10 of the California Code of Regulations, Part 6.2 of Division 2 of the

California Insurance Code, Chapter 5.8 of Title 10 of the California Code of Regulations, and Chapter 3 of Title 22 of the California Code of Regulations, and the Federal Codes mandating or enabling these state codes and regulations (collectively referred to as "Acts and Regulations" in this Agreement), and any provisions required to be in this Agreement by any of the above, as amended, shall bind the parties whether or not provided in this Agreement.

7.2  Plan is also subject to Benefits Agreements/Plan Contracts between the Plan and DHS, Plan and MRMIB, and the Plan and Local Initiative, amended from time to time. Any provisions required to be in this Agreement by these Benefits Agreements/Plan Contracts, as amended, shall bind both parties whether or not provided in this Agreement.

7.3  Hospital acknowledges and agrees that in the event Local Initiative finds Hospital non compliant with the Local Initiative, DHS or DOC performance standards, Local Initiative shall have the power to impose sanctions upon Hospital in accordance with, and subject to all appeals rights under, the Local Initiative sanctions policies and procedures as implemented from time to time by the Local Initiative.

7.4  Plan and Hospital agree that each shall comply with all applicable municipal and county ordinances and regulations, and all applicable state and federal statutes and regulations now or hereafter in force and effect to the extent that they directly or indirectly bear upon the subject matter of this Agreement.

7.5  Nothing set forth in the Agreement shall be deemed to amend, interpret, construe or otherwise affect in any way the Services Agreement between Local Initiative and Plan (referred to as the Benefits Agreement or the Plan Contract), as amended from time to time. To the extent there are any inconsistencies or contradictions between this Agreement and the Plan Contract, the terms and provisions of the Plan Contract shall prevail and control.

7.6  Hospital agrees to permit Plan, DOC, DHS, the United States Department of Health and Human Services ("DHHS"), the Local Initiative, or their authorized representatives, to inspect, examine or copy, at all reasonable times upon demand, all books, records and other papers relating to Covered Hospital Services rendered by or through Hospital under this Agreement, to the cost thereof, to the amount of any payments received therefor from Plan Members, or from others on such Plan Member's behalf, and to the financial condition of Hospital.

7.7  Hospital agrees to maintain, in a form in accordance with the general standards applicable to such book or record keeping at Hospital's place of business or at such other mutually agreeable location in California, the books, records and other papers provided for herein for at least five (5) years from the close of DHS's fiscal year in which this Agreement is in effect, and that such obligation shall not terminate upon termination of this Agreement, whether by rescission or otherwise.

7.8  Hospital agrees to permit access to Plan, DOC, DHS, MRMIB and the Local Initiative, or their authorized representatives, at all reasonable times upon demand, to inspect all facilities maintained or utilized by Hospital in the provision of Covered Hospital Services under this Agreement.

7.9  Hospital agrees to maintain and provide to Plan, and upon request, make available to DOC, DHS, MRMIB and the Local Initiative copies of all subcontracts for the provision of Covered Hospital Services, and to ensure that all such subcontracts are in writing, comply with the Act and Regulations and require that the subcontractor:

   (a) Make all applicable books and records available at all reasonable times for inspection, examination, or copying by DHS/MRMIB.

   (b) Retain such books and records for a term of at least five (5) years from the close of DHS'/MRMIB fiscal year in which the subcontract is in effect.

   (c) Comply with all applicable Local Initiative requirements applicable to Plan.

7.10 Hospital agrees to notify Plan, the Local Initiative and DHS/MRMIB in the event this Agreement is amended or terminated. Hospital further agrees to notify Plan, the Local Initiative and DHS/MRMIB in the event any agreement with a subcontractor for the provision of Covered Hospital Services is amended or terminated. Notice

to DHS is considered given when properly addressed and deposited in the United States Postal Services as first class registered mail, postage attached.

7.11 Hospital agrees to hold harmless both the State of California and Plan Members in the event Plan cannot or will not pay for Covered Hospital Services performed by Hospital pursuant to this Agreement.

7.12 The obligations set forth in this Article VII shall survive termination of this Agreement regardless of the cause giving rise to such termination.

## VIII.
## ACCESS TO AND CONFIDENTIALITY OF MEDICAL RECORDS

8.1 Hospital shall maintain for each Plan Member receiving Covered Hospital Services pursuant to this Agreement, a single standard medical record in such form and containing such information as may be required by the laws, rules and regulations of the State of California. The medical record shall include, at a minimum, medical charts, prescription orders, diagnoses for which medications were administered or prescribed, documentation of orders for laboratory, radiological, EKG, hearing, vision, and other tests and the results of such tests and other documentation sufficient to disclose the quality, quantity, appropriateness, and timeliness of Covered Hospital Services provided to the Plan Member under this Agreement. Each Plan Member's medical record shall be legible and maintained in detail consistent with good medical and professional practice which permits effective internal and external peer review and/or medical audit and facilitates an adequate system of follow-up.

8.2 Hospital shall safeguard the confidentiality of Plan Member information in accordance with applicable state and federal laws and regulations.

8.3 Authorized Plan representatives and duly authorized representatives of federal, state and local governments shall have access to Plan Member records upon forty-eight (48) hours advance notice and during customary business hours and shall be allowed to make notes and copies at their own expense, subject to all applicable state and federal laws and regulations relating to the confidentiality of patient medical records.

8.4 Consistent with laws relating to the confidentiality of patient medical records, Hospital shall make the medical records of Plan Members available to other Plan Providers to assure continuity of care for Plan Members.

8.5 Hospital shall ensure that all employed or contracting physicians and Health Professionals comply with the record maintenance, access and confidentiality provisions of this Agreement, as though each such provider were Hospital for purposes of this Agreement.

## IX.
## RELATIONSHIP OF THE PARTIES

9.1 Plan and Hospital each reserves the right to use and control the use of its name and all symbols, trademarks and service marks presently existing or later established by it. Neither Plan nor Hospital shall use the other party's name, symbols, trademarks or service marks in advertising or promotional materials or otherwise (with the exception of the use of Hospital's name in standard provider listings developed by Plan) without the prior written consent of that party, and shall cease any such usage immediately upon written notice of the other party or on termination of this Agreement, whichever sooner occurs.

9.2 None of the provisions of this Agreement is intended to create nor shall any be deemed or construed to create, any relationship between Plan and Hospital other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither Plan nor Hospital, nor any of their respective partners, contractors, employees, agents or representatives shall be construed to be the contractors, partners, employees, agents or representatives of the other. As independent contracting parties, Plan and Hospital maintain separate and independent management, and each has full, unrestricted authority and responsibility regarding its organization and structure.

9.3 Nothing set forth in this Agreement shall be deemed to amend, interpret, construe or otherwise effect in any way the Benefits Agreement/Plan Contract. To the extent there are any inconsistencies or contradictions between this Agreement and the Benefits Agreement/Plan Contract, the terms and provisions of the Benefits Agreement/Plan Contract shall prevail and control.

9.4 This Agreement shall not create, or be deemed or construed to create, any rights in any third party, including, without limitation, any Plan Member or Plan Provider, or any partner, contractor, employee, agent or representative of the preceding. The above notwithstanding, Plan and Hospital acknowledge and agree that the Local Initiative is intended to be benefited by, and shall have the rights of a third party beneficiary under this Agreement.

X.
LIABILITY, INDEMNITY AND INSURANCE

10.1 Neither Plan nor Hospital, nor any of their respective agents or employees, shall be liable to any third party for any act or omission of the other party.

10.2 Each party agrees to indemnify and hold DHS, the Local Initiative, Plan Members and each other harmless from and against any and all liability, loss, damage, claim and expense of any kind, including costs and attorneys' fees, which result from the negligent or willful performance or nonperformance by the indemnifying party or any of its agents, contractors, or employees or any of the duties and obligations of such party under this Agreement. If this Agreement is terminated, the rights and obligations of the parties regarding indemnification under this Section shall survive the termination hereof with respect to liability for acts or omissions that occurred prior to the effective date of termination.

10.3 Hospital, at its sole expense, agrees to maintain professional liability insurance of not less than five (5) million dollar per claim and twenty (20) million dollars annual aggregate, comprehensive general liability insurance, and such other available insurance as shall be necessary to insure Hospital and its employees against any and all damages arising from the performance of Hospital's duties and obligations under this Agreement. Hospital shall also provide Workers' Compensation coverage for its employees, as required by California law.

10.4 If the professional liability insurance procured by Hospital pursuant to Section 10.3 is on a "claims made" rather than "occurrence" basis, Hospital, upon termination of this Agreement, shall either obtain extended reporting malpractice insurance coverage ("tail" coverage) in a form acceptable to Plan with liability limits equal to those most recently in effect prior to the date of termination, or enter into such other arrangements as shall reasonably assure Plan of the maintenance of coverage applicable to the claims arising during the period in which this Agreement was in effect for a period of not less than seven (7) years after the effective date of termination hereof.

10.5 Hospital shall ensure that its professional liability carrier provides Plan with evidence of the professional liability coverage required by this Agreement, and notifies Plan at least thirty (30) days prior to the termination, cancellation or lapse of such coverage.

XI.
PLAN MEMBER COMPLAINTS AND DISPUTES

11.1 If Hospital receives any complaint regarding Hospital in connection with this Agreement, Hospital shall notify Plan within five (5) days of receipt thereof of all details of such complaint. In the event Plan receives a complaint regarding Hospital in connection with this Agreement, Plan shall notify Hospital of such complaint within five (5) days of receipt thereof.

11.2 Hospital agrees to cooperate and comply with the grievance and appeal procedures described in the Provider Services Manual for review and resolution of Plan Member clinical and non-clinical grievances and provider grievances, as established by the Local Initiative and Plan, and approved by DHS and DOC, and as amended from time to time.

11.3 In the event any complaint or grievance of a Plan Member cannot be settled through the such procedures, the matter may be submitted to an administrative hearing before the California Department of Social Services or other applicable administrative department or agency, or in the case of a Plan HFP Member, to arbitration. Hospital agrees to cooperate with and, when necessary, participate in any such administrative hearing or arbitration proceedings and be bound by the determinations of such administrative hearing or arbitration proceedings.

XII.
DISPUTE RESOLUTION

12.1 Plan and Hospital agree to meet and confer to resolve any dispute that may arise under this Agreement. Hospital may submit disputes to Plan at the address and telephone number provided in the notice section of this Agreement. Plan shall attempt to respond to all disputes within thirty (30) days of receipt, except in urgent cases in which Plan shall respond as soon as possible. If both parties agree, the dispute may be submitted to voluntary mediation or such other dispute settlement technique as the parties may mutually agree upon at such time. If any such dispute cannot be resolved, Hospital and Plan agree to submit such dispute to binding arbitration.

12.2 In the event arbitration between Plan and Hospital becomes necessary, such arbitration shall be initiated by either party making a written demand for arbitration on the other party. Such arbitration shall be conducted under the Commercial Rules of the American Arbitration Association using a mutually selected attorney arbitrator in Los Angeles, California.

XIII.
UNFORESEEN CIRCUMSTANCES

13.1 For so long as any natural disaster, war, riot, civil insurrection, epidemic or any other emergency or similar event not within the control of Hospital results in the facilities or personnel of Hospital being unavailable to provide or arrange for the provision of Covered Hospital Services, Hospital shall only be required to make a good faith effort to provide or arrange for the provision of such services, taking into account the impact of the event.

13.2 In the event the Covered Hospital Services that Hospital has agreed to provide are substantially interrupted pursuant to an event described above, Plan shall have the right to terminate this Agreement upon ten (10) days prior written notice to Hospital. Hospital's obligations under sections 6.5, 6.6, 6.7 and 10.4 of this Agreement shall also apply to terminations covered by this section.

XIV.
GENERAL PROVISIONS

14.1 Assignment. Neither party shall assign this Agreement or delegate any of its obligations hereunder without first obtaining the written consent of the other party. To the extent required by DHS, any such assignment or delegation shall be void unless prior written approval of such assignment or delegation is obtained from DHS.

14.2 Notices. Any notice required or permitted to be given pursuant to the terms and provisions of this Agreement shall be in writing and shall be personally delivered or sent by certified mail, return receipt requested, postage prepaid, to Plan at:

Care 1st Health Plan
1000 S. Fremont, Building A-11, Unit 22
Alhambra, CA 91803
Attn: Director of Provider Contracting

or to Hospital at:

St. Vincent Medical Center
c/o Catholic HealthCare West
215 S. Lake Avenue, 8th Floor
Pasadena, Ca 91101
Attn: ~~Ms. Mary~~ Michael Barnes, ~~Field Director, Managed Care.~~
& V.P. of Managed Care

Notices shall be deemed effective upon receipt. Either party may at any time change its address for notification purposes by mailing or delivering a notice as required hereinabove stating the change and setting forth the new address. The new address shall be effective on the third (3rd) day following the date such notice is received, unless a subsequent date of effectiveness is specified in said notice.

14.3 Severability. In the event any provision of this Agreement is rendered invalid or unenforceable by the California legislature or by any regulation duly promulgated by the State of California acting in accordance with law, or declared null and void by any court of competent jurisdiction, the remainder of the provisions of this Agreement shall, subject to Section 14.4, remain in full force and effect.

14.4 Effect of Severable Provision. In the event a provision of this Agreement is rendered invalid or unenforceable or declared null and void, as provided in Section 14.3, and its removal has the effect of materially altering the obligations of either party in such manner as, in the reasonable judgment of the party affected: (a) will cause serious financial hardship to such party; or (b) will cause such party to act in violation of its organizational documents, the party so affected shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the other party.

14.5 Entire Agreement. This Agreement, together with the Attachments, contains the entire agreement between Plan and Hospital relating to the rights granted and the obligations assumed under this Agreement. Any prior agreements, promises, negotiations or representations, either oral or written, relating to the subject matter of this Agreement not expressly set forth in this Agreement shall be of no force or effect. This Agreement may only be modified by a written agreement signed by both parties.

14.6 Amendment. This Agreement may be amended at any time during the term of this Agreement by the mutual written consent of the parties. Amendments shall comply with the Act and the Regulations and shall be submitted as necessary by Plan to DOC, DHS and the Local Initiative at least thirty (30) days before the effective date of any proposed changes governing compensation, services, or term. Proposed changes which require prior regulatory or other approval shall become effective upon receipt by Plan of notice of such approval. Additionally, this Agreement may be amended by Plan to the extent required by DOC, DHS or the Local Initiative as necessary to ensure that the terms of this Agreement comply with the provisions of the Act, the Regulations, the Managed Health Care System for Los Angeles County, California (Welfare and Institutions Code Section 14087.96 et seq.) and the regulations promulgated thereunder.

14.7 Attorney's Fees. In the event that either Hospital or Plan institutes any action, suit, or arbitration proceeding to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover its costs and reasonable attorney's fees.

14.8 Headings. The headings of the Articles and Sections contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

14.9 Conflict of Interest. Hospital warrants that no part of the total compensation provided herein shall be paid directly or indirectly to any officer or employee of the State of California as wages, compensation, or gifts in exchange for acting as an officer, agent, employee, subcontractor, or consultant to Hospital in connection with any work contemplated or performed relative to this Agreement. Hospital certifies that no member of or delegate of Congress, the General Accounting Office, HCFA or any other Federal agency has or will benefit financially or materially from this Agreement.

14.10 Waiver of Breach The waiver of any breach of this Agreement by either party shall not constitute a continuing waiver of any subsequent breach of either the same or any other provision of this Agreement.

Dec 13 04 12:38p
DEC. 13. 2004 12:58PM CARE1ST PNO DEPT NO. 8034 P. 2 p.2

14.11 Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties have duly executed this Agreement effective as of the day and year first above written.

Care 1st Health Plan

By: Donald S. Comstock Anna Tran
Title: CEO CFO
Date: 7/31/2001

Catholic HealthCare West, dba
St. Vincent Medical Center

By: Teri Daly Lewisstein
Title: Division Vice President
Date: 7/13/01

PD HOSP REV 01/2001
CHW 03.21.01
St. Vincent Medical Center 3-28-01

Page 15

CHW