# EXHIBIT A-2

# HOSPITAL SERVICES AGREEMENT
## (MS-DRG)

## BETWEEN

## CARE1ST HEALTH PLAN

## AND

## St. Vincent Medical Center

St. Vincent Medical Center
Hospital DRG Medicare only
v. 06-11gg
rev. 10.24.12jj

# CARE1ST HEALTH PLAN
## HOSPITAL SERVICES AGREEMENT

RECITALS...................................................................................................................................1

AGREEMENT.............................................................................................................................1

ARTICLE I. DEFINITIONS.......................................................................................................1

ARTICLE II. PLAN RESPONSIBILITIES ..............................................................................4

ARTICLE III. HOSPITAL RESPONSIBILITIES ....................................................................5

ARTICLE IV. COMPENSATION...............................................................................................8

ARTICLE V. UTILIZATION MANAGEMENT AND QUALITY IMPROVEMENT PROGRAM ...........10

ARTICLE VI. TERM AND TERMINATION OF AGREEMENT................................................12

ARTICLE VII. REGULATORY COMPLIANCE .....................................................................13

ARTICLE VIII. ACCESS TO AND CONFIDENTIALITY OF MEDICAL RECORDS.............14

ARTICLE IX. RELATIONSHIP OF THE PARTIES ...............................................................15

ARTICLE X. LIABILITY, INDEMNITY AND INSURANCE..................................................16

ARTICLE XI. PLAN MEMBER COMPLAINTS AND GRIEVANCES....................................16

ARTICLE XII. DISPUTE RESOLUTION.................................................................................16

ARTICLE XIII. UNFORESEEN CIRCUMSTANCES.............................................................17

ARTICLE XIV. GENERAL PROVISIONS...............................................................................17

ATTACHMENT A COVERED HOSPITAL SERVICES..........................................................20

ATTACHMENT B COVERED HOSPITAL SERVICES AND COMPENSATION SCHEDULE.................21

ATTACHMENT C PROFESSIONAL LIABILITY INSURANCE COVERAGE FORM ...............23

ATTACHMENT D DISCLOSURE FORM................................................................................24

## HOSPITAL SERVICES AGREEMENT

This Hospital Services Agreement ("Agreement") is entered into between **CAREIST HEALTH PLAN**("Plan"), a California Corporation and health plan, and St. Vincent Medical Center ("Hospital") to be effective from **1/1/2013** ("**Effective Date**").

### RECITALS

A. **WHEREAS,** Plan is licensed to operate a health care service plan under and subject to the requirements of the Knox-Keene Health Care Service Plan Act of 1975, as amended (the "Act"), and the rules promulgated thereunder ("DMHC Regulations");

B. **WHEREAS,** Plan arranges the provision of health care services to Medicare beneficiaries in Plan's Medicare Advantage Prescription Drug ("MA-PD") and Special Needs ("SNP") Plans under a contract with the Center for Medicare and Medicaid Services ("CMS");

C. **WHEREAS,** in order to provide such services, Plan desires to enter into contracts with hospitals, health care providers and professionals licensed and experienced in providing health care services to Medicare beneficiaries;

D. **WHEREAS,** Hospital is licensed and experienced in providing hospital services to Medicare beneficiaries; and

E. **WHEREAS,** Plan and Hospital desire to enter into this Agreement for Hospital to provide or arrange for the provision of certain hospital services and supplies to Plan Medicare Members.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties, having fully negotiated all terms and conditions herein, mutually agree as follows:

### ARTICLE I.
### DEFINITIONS

The following terms shall have the following meanings for purposes of this Agreement:

1.1 "Acts and Regulations" means the Federal and California codes and regulations that govern the services to be provided under this Agreement which are more fully described in Article VII.

1.2 "Ancillary Services" means those Covered Health Care Services necessary for the diagnosis and treatment of Plan Medicare Members, including, but not limited to, ambulance, ambulatory or day surgery, durable medical equipment, imaging services, laboratory, pharmacy, physical or occupational therapy, Emergency Services and other services customarily deemed ancillary.

1.3 "Attachment(s)" means the attachments, numbered A through D to this Agreement which are incorporated herein as if set forth in full and as of the Effective Date of this Agreement.

1.4 "Authorization" or "Authorized" means the approval by Plan for a Plan Medicare Member to be referred to a specialist physician, to be hospitalized in a hospital or a skilled nursing facility, to be prescribed pharmaceuticals not included in the Plan's drug formulary, or for covered Ancillary Services including durable medical equipment, home health hospital services, ambulatory surgery facility, and medical transportation services.

1.5 "Benefits Agreement" or "Plan Contract" means a written agreement between Plan and CMS which describes coverage for Covered Health Care Services to be provided to Plan Medicare Members.

1.6 "CMS" means the Centers for Medicare and Medicaid Services, the agency of the federal government responsible for administration of the Medicare program or its successor.

1.7 "Clean Claim" means a claim that has no defect, impropriety, lack of any required substantiating documentation including the substantiating documentation needed to meet the requirements for encounter data or particular circumstance requiring special treatment that prevents timely payment; and a claim that otherwise conforms to the clean claim requirements for equivalent claims under original Medicare.

1.8 "Coinsurance" means an amount that may be required as a share of cost for services after any deductibles are paid. Coinsurance is usually a percentage (for example, 20%).

1.9 "Coordination of Benefits" or "COB" mean the determination of order of financial responsibility that applies when two or more entities provide coverage of services for an individual.

1.10 "Co-payment" means an amount that may be required as a share of cost for a medical service or supply, like a doctor's visit, hospital outpatient visit, or a prescription. A copayment is usually a set amount, rather than a percentage. For example, $10 or $20 may be required for a doctor's visit or prescription.

1.11 "Covered Health Care Services" means those health care services and supplies covered under a Benefits Agreement/Plan Contract. Covered Health Care Services includes Covered Hospital Services.

1.12 "Covered Hospital Services" means those Covered Health Care Services which Hospital shall provide or arrange for the provision of to Plan Medicare Members, within the scope of its licensure, and which are described in Attachment A.

1.13 "Deductible" means the amount that must be paid for health care or prescriptions, before Original Medicare, the prescription drug plan, or other insurance begins to pay.

1.14 "DMHC" means the California Department of Managed Health Care regulating health care service plans in California.

1.15 "Downstream Entity" mean all health care providers or other entities contracted or subcontracted with Hospital to provide or arrange for Covered Hospital Services to Plan Medicare Members, including but not limited to individual physicians, ancillary providers, subcontracted administrative services vendors, third party administrators and management companies.

1.16 "Emergency Medical Condition" means a medical condition manifesting itself by the sudden onset of symptoms of acute severity, which may include severe pain, such that a reasonable person would expect that the absence of immediate medical attention could result in (1) placing the member's health (or, with respect to a pregnant woman, her pregnancy or health or the health of her fetus) in serious jeopardy, (2) serious impairment to bodily functions, or (3) serious dysfunction of any bodily organ or part.

1.17 "Emergency Services and Care" means medical screening, examination, and evaluation by a physician, or, to the extent permitted by applicable law, by other appropriate personnel under the supervision of a physician, to determine if an Emergency Medical Condition or "Active Labor" exists and, if it does, the care, treatment, and surgery by a physician necessary to relieve or eliminate the Emergency Medical Condition, within the capability of the facility. It also means an additional screening, examination, and evaluation by a physician, or other personnel to the extent permitted by applicable law and within the scope of their licensure and clinical privileges, to determine if a psychiatric Emergency Medical Condition exists, and the care and treatment necessary to relieve or eliminate the psychiatric Emergency Medical Condition, within the capability of the facility. Active Labor means a labor at a time at which either of the following

would occur: (1) There is inadequate time to effect safe transfer to another hospital prior to delivery, or (2) A transfer may pose a threat to the health and safety of the patient or the unborn child.

1.18    "Health Professional" means any nurse/physician extender (e.g., nurse practitioner, physician assistant) and other allied health professional, including but not limited to a health educator, dietician, laboratory technologist, audiologist, speech pathologist, psychologist, podiatrist, dentist, chiropractor, physical therapist, occupational therapist, clinical social worker, marriage, family and child counselor, optometrist or dispensing optician, who is licensed by the State of California and who provides certain Covered Health Care Services to Plan Medicare Members through an agreement with Plan or Hospital.

1.19    "Medi-Cal" means the federal and state funded health care program established by Title XIX of the Social Security Act, as amended administered in California by the California Department of Health Care Services (DHCS).

1.20    "Medically Necessary", as defined by applicable federal and state law, means those Covered Health Care Services, which are:

   (a)    Provided for the diagnosis or the direct care or treatment of a medical condition, illness or injury;

   (b)    Appropriate for the symptoms consistent with diagnosis and otherwise in accordance with generally accepted medical practice and professionally recognized standards;

   (c)    Not furnished primarily for the convenience of the Plan Member, the attending physician or other provider of services; and

   (d)    Performed at the most appropriate level that would provide safe and effective care for the Plan Member's medical condition. When applied to hospitalization, this means that the Plan Member requires acute care due to the nature of the services rendered or the Plan Member's condition, and that the Plan Member cannot receive safe and adequate care as an outpatient or at a lower level of care.

1.21    "Plan Hospital" means any institution licensed and certified for participation under Medicare and Medicaid (Medi-Cal) as an acute care hospital that provides certain Covered Health Care Services to Plan Medicare Members through an agreement with Plan.

1.22    "Plan Medicare Member" mean an individual eligible to receive Medicare benefits who has elected or has been assigned to Plan to receive applicable Medically Necessary Covered Health Care Services. A Plan Medicare Member may also be referred to in this Agreement as Plan Member.

1.23    "Plan Physician" means a physician duly licensed to practice medicine or osteopathy in accordance with applicable California law who has entered into an agreement with Plan, or a Plan Provider, to provide professional care and services to Plan Medicare Members.

1.24    "Plan Providers" means the physicians, medical groups, independent practice associations (IPAs), hospitals, skilled nursing facilities, home health agencies, pharmacies, ambulance companies, laboratories, X-ray facilities, durable medical equipment suppliers and other licensed health care entities or, professionals which or who provide Covered Health Care Services to Plan Medicare Members through an agreement with Plan, or another Plan Provider.

1.25    "Primary Care Physician" or "PCP" means a Plan Physician, chosen by or for a Plan Member and is primarily responsible for providing initial care to the Plan Member, maintaining the continuity of the Plan Member's care, providing Primary Care Services and initiating referrals to other Covered Health Care Services for the Plan Member. PCPs include general and family practitioners, internists, pediatricians, and primary care obstetricians/gynecologists.

1.26 "Provider Services Manual" means documentation of the Plan's medical and administrative policies, procedures, and performance standards applicable to services under this Agreement so long as any material terms that vary this Agreement are agreed to in advance in writing by Hospital. In the event of a conflict between the Agreement and the Provider Manual, the terms of the Agreement shall prevail.

1.27 "Quality Improvement Program" means Plan's program designed to (1) assure the provision of quality Covered Health Care Services to Plan Medicare Members, (2) document that quality of care provided is being reviewed, and (3) ensure that problems are identified, and effective corrective action is implemented and followed up.

1.28 "Service Area" means the geographical area comprised of those areas designated by the U.S. Postal Service Zip Codes that have been approved for the Plan by DMHC and CMS, and if applicable DHCS.

1.29 "Utilization Management Program" means Plan's program designed to review and manage the utilization of Covered Health Care Services provided to Plan Medicare Members.

**ARTICLE II.**
**PLAN RESPONSIBILITIES**

2.1 Plan Responsibility. Plan shall perform the administrative, operations, enrollment, member services, marketing, quality management and improvement, utilization management, regulatory compliance, and reporting functions appropriate and necessary for the administration of Plan Benefit Agreement/Plan Contracts and this Agreement.

2.2 Medical Group/PCP Assignment. Plan shall ensure that each Plan Medicare Member selects or is assigned to a Plan provider and/or to a Primary Care Physician to provide and make available Covered Health Care Services to the Plan Medicare Member.

2.3 Identification Cards. Plan shall provide or arrange for identification cards or other materials for Plan Medicare Members, to enable Hospital to identify Plan Medicare Members who are eligible to receive Covered Hospital Services from or through Hospital, and shall verify Plan Member eligibility and the Covered Hospital Services that the Plan Medicare Member is Authorized to receive upon request from Hospital.

2.4 Compensation. Plan shall compensate Hospital for Covered Hospital Services provided to Plan Medicare Members under the Agreement as fully described in Article IV below.

2.5 Monitor Quality of Care. Plan shall monitor the quality and utilization of health care provided to Plan Medicare Members in accordance with the Plan's Quality Improvement and Utilization Management Program policies and procedures set forth in the Provider Services Manual and all applicable legal requirements.

2.6 Delegation Agreement. If any of Plan's responsibilities under its contract with CMS is delegated to Hospital, such activities and reporting responsibilities shall be in a written delegation attachment to this Agreement. Plan reserves the right to revoke such delegation and reporting requirements if CMS or Plan determines that Hospital has not performed satisfactorily. Plan shall monitor such activities on an ongoing basis. If credentialing of medical professionals is delegated to Hospital, the credentialing process of the Hospital is subject to review and approval, and on going auditing, by the Plan. Hospital shall perform any delegated activity in compliance with all applicable Medicare laws, regulations, and CMS instructions.

2.7    Delegation.  If Hospital is delegated selection of other providers, contractors or subcontractors in the provision of Covered Services under this Agreement, Plan retains the right to approve, suspend or terminate any such arrangement.

2.8    Maintenance of Personnel and Facilities.  Plan shall, or require its authorized representative or agent to, maintain adequate personnel and facilities to provide telephone and written response to inquiries regarding eligibility, enrollment, Covered Services, and prior authorization for Hospital and Medical Services.  Plan will provide a current list, as well as timely updates, of all administrative personnel to whom any inquiries should be directed.

2.9    Financial Records.  Plan shall maintain in accordance with accepted accounting practices such financial and accounting information as shall be necessary, appropriate or convenient for the proper administration of Plan and this Agreement.  This section does not authorize Hospital to inspect or audit Plan's financial and accounting processes and information.

## ARTICLE III.
## HOSPITAL RESPONSIBILITIES

3.1    Provision of Covered Services.  Hospital shall provide or arrange for the provision of Covered Hospital Services described in Attachment A, and within the scope of its licensure, to Plan Medicare Members.

3.2    Arrangement and Availability of Covered Services.  Hospital shall provide or arrange for the staff, personnel, equipment, and facilities necessary for Plan Medicare Members to obtain Covered Hospital Services from Hospital.  Such Covered Hospital Services shall be available and accessible on a twenty-four (24) hours a day, seven (7) days a week basis.

3.3    Downstream Entities.  If any services under this Agreement is to be provided by a Downstream Entity contracted by Hospital, Hospital shall ensure that the Downstream Entity agrees to all conditions agreed to by the Hospital under this Agreement. Such Downstream Entity contracts are subject to approval by Plan, CMS, and applicable state agencies.

3.4    Subcontracts with Downstream Entities. Hospital agrees to maintain, provide to Plan, and, upon request, make available to CMS copies of all subcontracts for the provision of Covered Hospital Services and to ensure that all such subcontracts are in writing, comply with the Acts and Regulations, and require that the subcontractor:

  (i)    Make all applicable books and records relating to services under this Agreement available at all reasonable times for inspection, examination, or copying by CMS; and
  (ii)   Retain such books and records for a term of at least ten years from the close of the fiscal year in which the subcontract is in effect.

Hospital further agrees to notify Plan in the event any agreement with a subcontractor for the provision of Covered Hospital Services is amended or terminated. Notice is considered given when properly addressed and deposited in the United States Postal Service as first-class registered mail, postage attached.

3.5    Hospital as an Intermediary Organization.  To the extent applicable, if Hospital acts as an intermediary organization contracting on behalf of individual health care providers and/or facilities, the following shall apply: (a) Hospital agrees, if applicable, to pay any subcontracted provider promptly in accordance with federal and state rules and regulations and to comply with any other laws and regulations related to payment, administration or oversight of the provision of Covered Hospital Services rendered to a Member; (b) Hospital shall assure that its agreements with its subcontracted providers comply with the provisions of this Agreement and, as it pertains

to Medicare Members, applicable federal regulations in 42 CFR Section 422; and (e) Hospital agrees to act on Plan's behalf and take diligent action to enforce the obligations of this Agreement on any sub-contracted provider, including but not limited to the requirement to comply with federal and state laws, regulations, and Plan instructions that have a bearing on the services provided under this Agreement.

3.6 Plan Member Termination. Neither Hospital, Hospital's employees nor Hospital's subcontractors shall request, demand, require or otherwise seek, directly or indirectly, the termination from Plan or from the assignment of a Plan Medicare Member to the Hospital based upon the Plan Medicare Member's need for or utilization of medically required services, or in order to gain financially or otherwise from such termination. Hospital may request that Plan terminate the assignment of a Member for reasons of fraud, disruption of medical services, or failure to follow a Hospital's orders, or for any of the reasons specified by CMS for mandatory disenrollment. However, Hospital agrees that Plan shall have sole and ultimate authority to terminate a Plan Medicare Member's assignment or coverage, and Hospital understands that any requested termination of coverage of a Plan Medicare Member is subject to prior approval by CMS.

3.7 Emergency Services and Care. Hospital shall make available hospital Emergency Services and Care twenty-four (24) hours a day/seven (7) days a week. Hospital shall provide such hospital Emergency Services and Care when Medically Necessary and shall not be required to obtain prior Authorization for such Emergency Services and Care. Hospital shall notify Plan no later than the following business day after a Plan Medicare Member receives such hospital Emergency Services and Care from Hospital.

3.8 Hospital Communication with Plan Members. Hospital understands that it may freely communicate with Plan Medicare Members who are their patients any of the following: (a) communications necessary or appropriate for the delivery of health care services; (b) communications to Plan Medicare Members regarding treatment alternatives regardless of the provisions or limitations of the Plan Member's coverage; (c) communications to Plan Medicare Members regarding applicable rights to appeal coverage determinations; or (d) communications to Plan Medicare Members identifying the type of reimbursement arrangement under which Hospital is compensated for Hospital Services under this Amendment (i.e., fee-for-service, capitation, etc.), excluding any communications with regard to the applicable rates of reimbursement. Plan affirms that its utilization management decision making is based only on appropriateness of care and service and existence of coverage; that it does not specifically reward health care providers or plan staff for issuing denials of coverage or service care; and while it has risk/cost savings sharing arrangements with certain health care provider groups, these incentives are to encourage appropriate utilization and discourage under-utilization but not to encourage barriers to care and service or under-utilization.

3.9 Hospital Drug and Medication Policy. Hospital shall establish policies and procedures for the furnishing of drugs under emergency circumstances. Hospital emergency room shall provide, when the course of treatment of a Plan Medicare Member under emergency circumstances requires the use of drugs, a sufficient quantity of such drugs to last until the Plan member can reasonably be expected to have a prescription filled at a Plan network pharmacy.

3.10 Provider Services Manual. Hospital shall comply with all Plan policies and procedures set forth in the Provider Services Manual, and with all applicable state and federal laws and regulations relating to the delivery of Covered Hospital Services. Plan shall provide Hospital with a complete copy of its policies and procedures prior to the completed execution of this contract. Plan shall notify Hospital at least sixty (60) days prior to, except when federal or state laws or regulations require implementation of the change in a lesser time, any material change in its Provider Manual. Hospital has the right to negotiate and agree to any change. In the event that Plan and Hospital cannot agree regarding the proposed modification within thirty (30) business days, Hospital has the right to terminate this Agreement prior to implementation of the change. In the event of a conflict between the Agreement and the Provider Manual, the terms of the Agreement shall prevail.

3.11   Authorizations.  Hospital agrees to obtain verbal or written Authorization, in accordance with Plan's policies and procedures, prior to admission of a Plan Medicare Member to Hospital, and prior to providing Covered Hospital Services to a Plan Medicare Member, except for an admission or Covered Hospital Services rendered in connection with the rendering of Emergency Services and Care. The Hospital shall obtain approval for emergency admissions on the day after admission or when the day of admission is not a business day, the first business day thereafter. Failure to notify Plan in a timely manner may result in a denial.

3.12   Standard of Care.  Hospital shall provide or arrange for the provision of Covered Hospital Services to Plan Medicare Members in the same manner and in accordance with the same standards of care and other standards, skill and diligence, and with the same time availability as it provides or arranges for the provision of hospital and other services and supplies to all other patients of Hospital.

3.13   Discrimination.  Hospital shall not discriminate against any Plan Medicare Member on the basis of race, color, national origin, ancestry, religion, sex, marital status, sexual orientation, mental or physical impairment, genetic characteristics, or age.

3.14   Referral to Plan Providers.  Except in an Emergency, or if no other Plan Provider is available, or the Plan Member's condition requires treatment elsewhere, Hospital shall make best efforts to refer Plan Medicare Members only to other Plan Providers for Covered Hospital Services and other Covered Health Care Services.

3.15   Licensure.  Hospital shall maintain all licenses required by law to operate its facilities, all certifications necessary for Hospital to participate in Medicare and Medicaid (Medi-Cal) programs, and accreditation by the Joint Commission (TJC). Hospital agrees to notify Plan promptly in the event that any action is taken against any such license, certification, or accreditation.

3.16   Advance Directive.  Hospital shall ensure that it prominently documents in a Plan Medicare Member's medical record maintained by the Hospital whether or not the Plan Medicare Member has executed an advance directive.

3.17   Plan Member Transfer or Termination.  Hospital shall not ask Plan to terminate a Plan Medicare Member or transfer a Plan Medicare Member to another Plan Hospital because of the Plan Medicare Member's medical condition.

3.18   Cultural and Linguistic Services.  Hospital shall participate in and comply with the performance standards, policies, procedures, and programs established from time to time by the Plan and CMS with respect to the provision of Covered Hospital Services to Plan Medicare Members in a culturally and linguistically appropriate manner. Hospital shall also comply with laws applicable to Hospital to provide interpreter services to patients, including Plan Medicare Members, with limited English proficiency.

3.19   Reporting to Plan.  Upon request by the Plan and subject to applicable federal and state law and CMS instructions, Hospital shall promptly provide Plan with such financial, capacity, encounter data or other information, reports, documents or forms as may be required to enable Plan to fulfill its reporting and other obligations under the Benefits Agreement or as otherwise required for purposes of compliance with the Acts and Regulations. Hospital agrees to provide Plan with encounter data and other informational data, including risk adjustment data, sufficient to meet its reporting obligations under the Medicare program and Hospital's performance under this Agreement as required by law. Plan shall have sole responsibility for filing reports, obtaining approval from, and complying with the applicable laws and regulations of federal, state and local governmental agencies having jurisdiction over Plan.

3.20     Health Professional Licensure. Hospital shall ensure that the Health Professionals employed by or under contract with Hospital shall be appropriately licensed to provide health care services in the State of California, shall have met and continue to meet all applicable state laws, regulations and Plan standards of care, and shall submit evidence of such licensure to Plan upon request. Hospital agrees to notify Plan promptly in the event that any action is taken against any such license, certification, or accreditation.

3.21     Privileges to Plan Physicians. Hospital agrees to cooperate to the fullest extent possible in granting Hospital medical staff privileges to Plan Physicians; provided however, that nothing shall prevent Hospital from requiring that such Plan Physicians meet Hospital's credentialing standards and comply with such medical staff bylaws, rules and regulations, policies and procedures as may be adopted from time to time by Hospital and its medical staff. Hospital shall, from time to time, notify Plan of the names of such Plan Physicians to the extent permitted by its medical staff policies and protocols and so long as the disclosures shall not compromise the confidentiality of the medical staffs records pursuant to California Evidence Code Section 1157 or other applicable laws. Hospital agrees to respond to periodic inquiries from Plan as to whether any Plan Physician retains any such privileges granted by Hospital's medical staff and shall, at Plan's request, provide Plan with evidence of medical malpractice insurance coverage for each of the Plan Physicians on its medical staff.

3.22     Compliance with Laws and Regulations. Hospital agrees to abide by the compliance policies and applicable standards of conduct in the Anti-Fraud Plan established by Plan in compliance with State and Federal health care fraud waste and abuse laws and regulations to the extent that they bear upon the subject matter of this Agreement.

3.23     Delegation Agreement. If any of Plan's responsibilities under its contract with CMS is delegated to Hospital, such activities and reporting responsibilities shall be in a written delegation attachment to this Agreement. Plan reserves the right to revoke such delegation and reporting requirements if CMS or Plan determines that provider has not performed satisfactorily. Such activities shall be monitored by the Plan on an ongoing basis. If credentialing of medical professionals is delegated to Provider, the credentialing process of the Hospital is subject to review and approval, and on going auditing, by the Plan. Hospital shall perform any delegated activity in compliance with all applicable Medicare laws, regulations, and CMS instructions.

3.24     Delegation. If Hospital is delegated selection of providers, contractors or subcontractors in the provision of Covered Services under this Agreement, Plan retains the right to approve, suspend or terminate any such arrangement.

## ARTICLE IV.
## COMPENSATION

4.1     Claims Submittal Procedure. Hospital shall submit claims for Covered Hospital Services rendered under this Agreement on a UB-04 form, providing all the information and data fields required by CMS for a Medicare claim. If the capability exists, the Hospital shall bill electronically, providing the same information required on a UB04 using a HIPAA compliant transaction set. Hospital shall code all bills in a manner that accurately reflects the Hospital Services performed, including, but not limited to, bundling procedures which, under standard billing practice, are bundled together. Should, in the opinion of Plan, Hospital code bills so that the bills do not accurately reflect the services performed, Plan may, subject to the appeal rights of the Hospital, deny the inaccurate codes, and reimburse Hospital according to the correct codes. Where applicable, Hospital agrees to include the unique national standard Hospital identification number issued by CMS or Plan's assigned Hospital number on claims submitted to Plan. Failure to supply this number on the claim submitted shall render a claim unclean.

4.2     Date of Receipt. Plan shall maintain a written or electronic record of the date of receipt of a claim from Hospital. Hospital may inspect such record on request and the parties may rely on that record or on any other admissible evidence as proof of the fact of receipt of the claim, including, without limitation, electronic or facsimile confirmation of receipt of a claim.

4.3     Compensation to Hospital. Plan shall pay Hospital for Covered Hospital Services rendered to Plan Medicare Members according to the compensation schedule set forth in Attachment B. Unless a claim for payment is disputed, Plan shall promptly make payment on each Clean Claim, timely submitted by Hospital, for Covered Hospital Services rendered to a Plan Member, within the time frame specified in the Agreement, or by federal and state law or regulation, including but not limited to 42 CFR §422.520 and California Provider Claims and Disputes Settlement regulations. Such amounts, together with applicable co-payments, if any, shall constitute payment in full to Hospital for Covered Hospital Services provided to Plan Medicare Members. All payments shall be made in accordance with Plan policies and applicable laws and regulations. Plan shall be responsible for payment to Hospital for Covered Hospital Services provided for Plan Medicare Members, other than for applicable Coinsurance, Deductibles, or Co-payments, for the duration of the period for which payments from CMS have been made. Plan shall also be responsible for payment to Hospital, other than for applicable Coinsurance, Deductibles, or Co-payments for Plan Medicare Members who are hospitalized on the date Plan's contract with CMS terminates, or in the event of an insolvency, through discharge. After termination of this Agreement, Plan shall be responsible to pay Hospital, other than for applicable Coinsurance, Deductibles, or Co-payments, until the services being rendered to the Plan Medicare Member by Hospital are completed, unless Plan makes reasonable and medically appropriate provision for the assumption of such services by another Participating Hospital. Plan shall reimburse Hospital for all Covered Hospital Services rendered pursuant to this section, other than applicable Coinsurance, Deductibles, or Co-payments, at the same rates in use prior to termination and Hospital shall accept such payment, together with any applicable Coinsurance, Deductibles, or Co-payments, as payment in full.

4.4     Payment for Services. Hospital shall accept payments specified in Attachment B as payment in full except for any applicable Coinsurance, Co-payments and Deductibles, and shall not hold any Plan Medicare Member liable for payment of any fees that are the legal obligation of the Plan, other than for applicable Coinsurance, Deductibles, or Co-payments, due to the Hospital. Hospital shall not bill, charge, collect a deposit or other sum or seek compensation, remuneration or reimbursement from, or maintain any action at law or have any other recourse against, or make any surcharge upon, a Plan Medicare Member or other person acting on a Plan Medicare Member's behalf to collect sums owed by Plan. For Plan Medicare Members eligible for both Medicare and Medicaid, Hospital shall not hold such Plan Medicare Members liable for Medicare Part A and B cost sharing when the State is responsible for paying such amounts. For such Plan Medicare Members, Hospital will (a) accept the MA plan payment as payment in full, or (b) bill the appropriate State source. This provision shall survive termination of this Agreement whether by rescission or otherwise.

4.5     Balance Billing to Plan Members. Hospital agrees that in no event, including but not limited to nonpayment by Plan, Plan's insolvency or Plan's breach of this Agreement, shall any Plan Medicare Member be liable for any sums owed by Plan, and Hospital shall not bill, charge, collect a deposit or other sum or seek compensation, remuneration or reimbursement from, or maintain any action at law or have any other recourse against, or make any surcharge upon, a Plan Medicare Member or other person acting on a Plan Medicare Member's behalf to collect sums owed by Plan. If Plan receives notice of any surcharge upon a Plan Medicare Member, it shall take appropriate action, including but not limited to terminating this Agreement and requiring that Hospital provide the Plan Medicare Member with an immediate refund of such surcharge.

4.6     Balance Billing to Plan Members. Hospital agrees to hold harmless both CMS and Plan Members including dual eligible Plan Members in the event Plan cannot or will not pay for Covered Hospital Services provided to Plan Members hereunder.

4.7     Balance Billing to Plan Members due to Torts. Hospital agrees that it will make no claim for recovery of the value of Covered Hospital Services rendered to a Plan Medicare Member when such recovery would result from an action involving the tort liability of a third party or casualty liability insurance including Worker's Compensation awards and uninsured motorist's coverage. Hospital will identify and notify Plan of cases in which an action by the Plan Medicare Member involving the tort or Worker's Compensation liability of a third party could result in recovery by the Plan Medicare Member of funds to which CMS has lien rights under Article 3.5, Part 3, Division 9 of the Welfare and Institutions Code. Hospital shall refer such cases to Plan within five (5) days of discovery in order for Plan to fulfill its obligation to report such cases to CMS within ten (10) days of discovery.

4.8     MS-DRGs. If the Hospital is compensated using Diagnosis Related Groups (DRGs) for any Plan Medicare Member admitted to Hospital for Covered Hospital Services that is transferred to another hospital, Hospital will be reimbursed on a pro-rata basis based on the number of days the Plan Medicare Member utilized at Hospital as a percentage of the average length of stay used in the development of the DRG in accordance with CMS Transfer DRG Guideline.

4.9     Terminally Ill Member. Notwithstanding any other provision of this Agreement, unless Hospital is terminated for cause or breach, as set forth in relevant sections of the Agreement between the Parties, or in this Agreement, if Hospital is rendering Covered Hospital Services to any Plan Medicare Member who is determined to be terminally ill, as defined under Section 1861 (dd) (3) (A) of the Social Security Act, at the time of Hospital's termination, Plan shall allow Hospital, to continue, at the Plan Medicare Member's option, to provide health services to the Medicare Member for the remainder of the Plan Medicare Member's life for care directly related to the treatment of the terminal illness. Plan shall compensate Hospital at the rate of compensation provided for herein.

4.10    Co-Payment. Hospital shall be responsible for collecting all applicable Coinsurance, Co-payments, or Deductibles, as specified in applicable Summary of Benefits copies of which have been received by Hospital, from Plan Medicare Members directly and shall be entitled to retain any and all such sums in addition to the compensation provided for under this Agreement.

4.11    Section Survivability. The provisions set forth in this Article shall survive termination of this Agreement regardless of the cause giving rise to such termination and shall be construed for the benefit of Plan Medicare Members, and shall supersede any oral or written agreement to the contrary now existing or hereafter entered into between Hospital and any Plan Member or any person acting on his/her behalf.

## ARTICLE V.
## UTILIZATION MANAGEMENT AND QUALITY IMPROVEMENT PROGRAM

5.1     Utilization Management Program. Plan shall establish a Utilization Management Program ("UM Program") to review the medical necessity of Covered Hospital Services furnished by Hospital to Plan Medicare Members on an inpatient and outpatient basis. Hospital shall reasonably comply with applicable requirements of this UM Program and agreed to by Hospital prior to executing this Agreement. Hospital may appeal adverse determinations in accordance with the procedures established by Plan. Plan may amend the UM Program by providing forty five (45) business days' prior written notice to Hospital. Hospital shall be bound by such amendment at the end of such forty five (45) business day period unless (i) Hospital provides Plan with notice of objection within the forty five (45) business day notice period that is within Hospital's reasonable discretion, (ii) such change is not made in order to comply with a

change in State or Federal Law, and/or (iii) such change add/or affects a material duty or responsibility of Hospital, and/or (iv) such change has a material adverse economic effect upon Hospital. In such event, Hospital and Plan shall seek to agree to an amendment to this Agreement that satisfactorily addresses the effect on Hospital's material duty or responsibility and reimburses the material economic detriment caused to Hospital. In such event, the amendment to the UM Program shall not be effective unless and until the parties amend this Agreement through a written amendment signed by both parties. If no agreement is reached between the parties, either party may terminate the Agreement as provided in this Agreement under no cause termination. Failure to comply with requirements of the UM Program may be deemed by Plan to be a material breach of this Agreement and may, at Plan's option, be grounds for termination of this Agreement. Hospital agrees that payment to Hospital may be denied for those Covered Hospital Services provided to a Plan Medicare Member which are determined not to be Medically Necessary or for which Hospital failed to receive prior written Authorization in accordance with Plan's Utilization Management Program Authorization procedures. All documents and information received or obtained by Hospital during its activities pursuant to this Section shall be held confidential by Hospital during and after the term of this Agreement and shall not be disclosed to any person without the prior written consent of Plan.

5.2     Quality Improvement Program.   Plan shall establish a Quality Improvement Program ("QI Program") to review the medical appropriateness and quality of Covered Hospital Services furnished by Hospital to Plan Medicare Members on an inpatient and outpatient basis. Hospital shall reasonably comply with applicable requirements of this QI Program and agreed to by Hospital prior to executing this Agreement. Hospital may appeal adverse determinations in accordance with the procedures established by Plan. Plan may amend the QI Program by providing forty five (45) business days' prior written notice to Hospital. Hospital shall be bound by such amendment at the end of such forty five (45) business day period unless (i) Hospital provides Plan with notice of objection within the forty five (45) business day notice period that is within Hospital's reasonable discretion, (ii) such change is not made in order to comply with a change in State or Federal Law, and/or (iii) such change add/or affects a material duty or responsibility of Hospital, and/or (iv) such change has a material adverse economic effect upon Hospital. In such event, Hospital and Plan shall seek to agree to an amendment to this Agreement that satisfactorily addresses the effect on Hospital's material duty or responsibility and reimburses the material economic detriment caused to Hospital. In such event, the amendment to the QI Program shall not be effective unless and until the parties amend this Agreement through a written amendment signed by both parties. If no agreement is reached between the parties, either party may terminate the Agreement as provided in this Agreement under no cause termination. Failure to comply with requirements of the QI Program may be deemed by Plan to be a material breach of this Agreement and may, at Plan's option, be grounds for termination of this Agreement. All documents and information received or obtained by Hospital during its activities pursuant to this Section shall be held confidential by Hospital during and after the term of this Agreement and shall not be disclosed to any person without the prior written consent of Plan.

5.3     Retroactive Review of Services Provided.  Hospital shall obtain from Plan verification of the eligibility of all Members who receive Covered Hospital Services pursuant to this Agreement. However, Hospital shall not be required to obtain eligibility verification prior to rendering Emergency Services and Care. If there are any errors by Plan in the verification of eligibility, which results in Hospital providing Hospital Services to ineligible patients, Plan shall be liable to reimburse Hospital per the terms and conditions contained herein this Agreement for any such services rendered in good faith to ineligible patients. Retroactive disenrollment of a Plan Medicare Member by CMS or its designee is not to be construed as an error by Plan. In the event Hospital follows correct authorization procedures, and receives an authorization to provide Covered Hospital Services to a Plan Medicare Member, Plan shall be liable to reimburse Hospital per the terms and conditions of this Agreement. Under no circumstances shall payment for such (that is, when Hospital follows correct authorization procedures, and receives an authorization to provide Covered Hospital Services) previously authorized services be denied retroactively for lack of medical necessity.

## ARTICLE VI.
## TERM AND TERMINATION OF AGREEMENT

6.1     Term and Auto-renewal.   This Agreement shall be effective for one year from the Effective Date. Thereafter, this Agreement shall be automatically renewed for one (1) year calendar periods without the necessity of notice or action by either party, provided, however, that this Agreement may be terminated as provided below and as otherwise expressly provided herein.

6.2     Termination Without Cause.  Notwithstanding any other provision of this Agreement, either party may terminate this Agreement without cause, by providing the other party with at least one-hundred twenty (120) days written notice of termination, provided, however, that no termination of this Agreement pursuant to this Section 6.2 shall be effective prior to December 31, 2013. For cause termination may be effected for material breach of this Agreement or default in the performance of any material provision hereof. If such breach or default is not cured to the reasonable satisfaction of the non-breaching party within thirty (30) days of receipt of written notice from the non-breaching party specifying the breach or default, this Agreement shall terminate upon thirty (30) days written notice.

6.3     Immediate Termination.  Notwithstanding the above, this Agreement may be immediately terminated by Plan for cause in the event of any of the following circumstances:

   (a) Hospital's license to provide Covered Hospital Services in the State of California is suspended or revoked; or

   (b) Hospital fails to maintain professional liability coverage in at least the minimum amount specified in Section 10.3 of this Agreement; or

   (c) Plan, DMHC, or CMS determines that the health, safety, or welfare of Plan Medicare Members is jeopardized by Hospital continuing to provide Covered Hospital Services under this Agreement.

   (d) The Benefits Agreement/Plan Contract is terminated.

   Notwithstanding the above, this Agreement may be immediately terminated by Hospital for cause in the event of any of the following circumstances (i) revocation of Plan's license necessary for the performance of this Agreement; or (ii) the filing of bankruptcy by Plan, a parent or subsidiary or substantial deterioration in the financial condition of a parent, affiliate or subsidiary.

6.4     Records Upon Termination.  In the event of termination of this Agreement and subject to applicable law, Hospital shall immediately make available to Plan, CMS and DMHC, or its designated representative in a usable form, any or all records, whether medical or financial, related to Hospital's performance under this Agreement. Plan agrees that it shall reimburse Hospital for copying all documents required or requested to be submitted to Plan under this Agreement, including but not limited to medical records/and or related information including Hospital bills, at the rate of twenty-five cents ($.25) per page.

6.5     Member Care Upon Termination.  All terms and provisions of this Agreement shall remain in effect until the effective date of termination. After termination of this Agreement, Hospital shall continue to provide Covered Hospital Services to each Plan Medicare Member who is receiving Covered Hospital Services from Hospital on the effective date of termination of this Agreement, until the effective date of discharge or the transfer of such Plan Medicare Member to another Plan hospital for further treatment. Hospital shall continue to provide Covered Hospital Services under such circumstances at the compensation rates in effect under this Agreement.

6.6    Access to Records. Notwithstanding termination of this Agreement, Plan shall continue to have access to Hospital's records in accordance with the provisions of this Agreement, to the extent permitted by law and as necessary to ensure continuity of care of Plan Members and to fulfill requirements of this Agreement and Plan's obligations under all applicable laws, rules and regulations.

## ARTICLE VII.
## REGULATORY COMPLIANCE

7.1    Acts and Regulations. Plan is subject to the provisions governing health plans in the California Health and Safety Code and regulations promulgated under these codes, the Federal codes and regulations mandating or enabling these state codes and regulations, Federal codes and regulations, and CMS instructions, governing Medicaid and Medicare programs, and other Federal codes and regulations governing health plan operations (collectively referred to as "Acts and Regulations" in this Agreement), and any provisions required to be in this Agreement by any of the above, as amended, shall bind the parties whether or not provided in this Agreement.

7.2    Medicare Advantage Program.    Hospital agrees to comply with 42 CFR § 422 regarding the performance of Hospital's obligations hereunder, including without limitation, laws or regulations governing the record timeliness, adequacy and accuracy, Plan Medicare Member privacy and confidentiality along with the appeal and dispute resolution procedures related to Covered Hospital Service provided to a Plan Medicare Member. Hospital shall specifically comply with all applicable Medicare laws, regulations, and CMS instructions.

7.3    Plan Contracts. Plan is also subject to Benefits Agreements/Plan Contracts between the Plan and CMS amended from time to time. Any provisions required to be in this Agreement by these Benefits Agreements/Plan Contracts, as amended, shall bind both parties whether or not provided in this Agreement. To the extent there are any inconsistencies or contradictions between this Agreement and an applicable Plan Contract, the terms and provisions of the Plan Contract shall prevail and control. If Hospital does not agree such interpretation or application of a Plan Contract provision, Hospital may terminate this Agreement as provided in the Term and Termination article of the Agreement.

7.4    Federal, State, and Local Regulations. Plan and Hospital agree that each shall comply with all applicable municipal and county ordinances and regulations, and all applicable state and federal statutes and regulations now or hereafter in force and effect to the extent that they directly or indirectly bear upon the subject matter of this Agreement.

7.5    Records relating to Hospital Services for Plan Medicare Members. Hospital shall maintain timely and accurate medical, financial and administrative records related to Hospital Services rendered by Hospital to Plan Medicare Members under this Agreement unless a longer time period is required by applicable statutes or regulations. Subject to applicable law, Hospital shall maintain the contracts and administrative, financial and medical records, patient care documentation, other records of Hospital, sub-contractors, or related entities during the term of this Agreement and for ten (10) years following: (a) the end of any term of this Agreement; or (b) the date of completion of any audit. These obligations of the Hospital shall not terminate upon termination of this Agreement, whether by rescission or otherwise.

7.6    Inspection of Records. Hospital agrees to permit, at all reasonable times upon demand, Plan, CMS, the Department of Health and Human Services (DHHS), the Comptroller General, state regulatory agencies with proper authority or their designees to audit, evaluate or inspect and make copies of, all records maintained by Hospital pertaining to applicable Covered Hospital Services rendered under this Agreement and other papers relating to Covered Hospital Services rendered by or through Hospital under this Agreement, to the cost thereof, to the amount of any payments received therefore from

Plan Medicare Members, or from others on such Plan Medicare Member's behalf. Plan or its designee shall have the right to conduct periodic audits of such records and may audit its own records to determine if amounts have been properly paid under this Agreement. Plan shall provide Hospital with the results of any such audits and any amounts determined to be due and owing as a result of such audits shall be promptly paid. This provision shall survive the termination of this Agreement. Any right to refund amounts owed shall be subject to the applicable statute of limitations for recovery. Hospital will not allow any off-set from any other amounts owing or becoming due to Hospital unless requested refund has not been received from Hospital within ninety (90) days from date of request. In such event, Plan shall provide Hospital with an explanation as to the reasons and basis of calculation of such adjustments and afford Hospital a reasonable opportunity to challenge such action. The right of the DHHS, the Comptroller General or their designees to inspect, evaluate and audit shall extend through ten (10) years from the end of the final contract period or completion of audit, whichever is later, unless provisions in 42 CFR § 422.504 (i) apply.

7.7   Facility Inspection.   Hospital agrees to permit access to Plan, CMS or their authorized representatives, at all reasonable times upon demand, to inspect all facilities maintained or utilized by Hospital in the provision of Covered Hospital Services under this Agreement.

7.8   Exclusions from Federal Programs. Hospital represents and warrants to Plan that: (a) neither Hospital nor any of its affiliates are excluded from participation in any federal health care program, as defined under 42 U.S.C § 1320a-7b (f), for the provision of items or services for which payment may be made under such federal health care program; (b) Hospital has not arranged or contracted (by employment or otherwise) with any employee, contractor or agent that Hospital or its affiliates know or should know are excluded from participation in any federal health care program, to provide items or services hereunder; and (c) no final adverse action, as such term is defined under 42 U.S.C. Section 1320a-7e (g), has occurred or is pending or threatened against Hospital or its affiliates or to Hospital's knowledge against any employee, contractor or agent engaged to provide items or services under this Agreement (collectively "Exclusions/Adverse Actions"). Hospital, during the term of this Agreement, shall notify Plan of any Exclusions/Adverse Actions or any basis therefore within five (5) business days of Hospital's learning of any such Exclusions/Adverse Actions or any basis therefore.

7.9   Subcontracts with Down Stream Entities. Hospital agrees to maintain and provide to Plan, upon request, copies of all subcontracts with Downstream Entities for the provision of Covered Hospital Services, and to ensure that all such subcontracts are in writing, comply with the Act and Regulations and require that the Downstream Entity complies with Medicare laws and regulations and CMS instructions Hospital is bound by this Agreement to comply with.

7.10   Downstream Entity Agreements.   Hospital agrees to notify Plan in the event any agreement with a Downstream Entity for the provision of Covered Hospital Services is amended or terminated.

7.11   Equal Opportunity.   Hospital agrees to comply with the provisions of the Equal Opportunity Clause contained in 41 CFR § 60-1.4(a) and the Affirmative Action Clauses contained in 41 CFR.

## ARTICLE VIII.
### ACCESS TO AND CONFIDENTIALITY OF MEDICAL RECORDS

8.1   Medical Records. Hospital shall maintain for each Plan Medicare Member receiving Covered Hospital Services pursuant to this Agreement, a single standard medical record in such form and containing such information as may be required by state and federal laws and regulations and Plan policies. The medical record shall include, at a minimum, medical charts, prescription orders, diagnoses for which medications were administered or prescribed, documentation of orders for laboratory, radiological, EKG, hearing, vision, and other tests and the results of such tests and other documentation sufficient to disclose the

quality, quantity, appropriateness, and timeliness of Covered Hospital Services provided to the Plan Medicare Member under this Agreement. Each Plan Medicare Member's medical record shall be maintained in detail consistent with good medical and professional practice which permits effective internal and external peer review and/or medical audit and facilitates an adequate system of follow-up.

8.2    Confidentiality. Hospital shall safeguard the confidentiality of Plan Medicare Member information in accordance with applicable state and federal laws and regulations.

8.3    Access to Member Records. Authorized Plan representatives and duly authorized representatives of federal, state and local governments shall have access to Plan Medicare Member records upon reasonable advance notice and during customary business hours and shall be allowed to make notes and copies at their own expense, subject to all applicable state and federal laws and regulations relating to the confidentiality of patient medical records.

8.4    Records for Continuity of Care. Consistent with laws relating to the confidentiality of patient medical records, Hospital shall make the medical records of Plan Medicare Members available to other Plan Providers to assure continuity of care for Plan Medicare Members.

8.5    Compliance to Record Confidentiality. Hospital shall ensure that all employed or contracting physicians and Health Professionals comply with the record maintenance, access and confidentiality provisions of this Agreement, as though each such provider were Hospital for purposes of this Agreement.

## ARTICLE IX.
## RELATIONSHIP OF THE PARTIES

9.1    Confidentiality/Trademarks and Service Marks. Plan and Hospital each reserves the right to use and control the use of its name and all symbols, trademarks and service marks presently existing or later established by it. Neither Plan nor Hospital shall use the other party's name, symbols, trademarks or service marks in advertising or promotional materials or otherwise (with the exception of the use of Hospital's name in standard provider listings developed by Plan) without the prior written consent of that party, and shall cease any such usage immediately upon written notice of the other party or on termination of this Agreement, whichever sooner occurs. Hospital, as well as Plan and Payors, shall keep strictly confidential all compensation arrangements set forth in this Agreement and its Exhibits, to other Participating Providers who may from time to time be responsible for compensating Provider for Covered Services rendered by Hospital to a Member of Plan. Hospital, at it's own discretion may authorize entities and/or agents working on behalf of the Hospital to review Plan agreements, including compensation. These entities are subject to the same confidentiality provisions as any other Hospital employee.

9.2    Independent Contracting Parties. None of the provisions of this Agreement is intended to create nor shall any be deemed or construed to create, any relationship between Plan and Hospital other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither Plan nor Hospital, nor any of their respective partners, contractors, employees, agents, or representatives shall be construed to be the contractors, partners, employees, agents, or representatives of the other. As independent contracting parties, Plan and Hospital maintain separate and independent management, and each has full, unrestricted authority and responsibility regarding its organization and structure.

9.3    Benefits Agreement/Plan Contract. Nothing set forth in this Agreement shall be deemed to amend, interpret, construe, or otherwise effect in any way the Benefits Agreement/Plan Contract. To the extent there are any inconsistencies or contradictions between this Agreement and the Benefits Agreement/Plan Contract, the terms and provisions of the Benefits Agreement/Plan Contract shall prevail and control. If Hospital does not agree with such interpretation or application of a Plan Contract provision, Hospital may terminate this Agreement as provided in the Term and Termination article of the Agreement.

9.4    Third Party Beneficiary. This Agreement shall not create, or be deemed or construed to create, any rights in any third party, including, without limitation, any Plan Medicare Member or Plan Provider, or any partner, contractor, employee, agent or representative of the preceding.

## ARTICLE X.
## LIABILITY, INDEMNITY AND INSURANCE

10.1    Limitation of Liability. Neither Plan nor Hospital, nor any of their respective agents or employees, shall be liable to any third party for any act or omission of the other party.

10.2    Liability Insurance. Hospital, at its sole expense, agrees to maintain professional liability insurance of not less than ONE (1) MILLION DOLLARS per claim and THREE (3) MILLION DOLLARS annual aggregate, comprehensive general liability insurance, and such other available insurance as shall be necessary to insure Hospital and its employees against any and all damages arising from the performance of Hospital's duties and obligations under this Agreement. Hospital shall also provide Workers' Compensation coverage for its employees, as required by California law.

10.3    "Tail" Coverage. If the professional liability insurance procured by Hospital pursuant to Section 10.3 is on a "claims made" rather than "occurrence" basis, Hospital, upon termination of this Agreement, shall either obtain extended reporting malpractice insurance coverage ("tail" coverage) in a form acceptable to Plan with liability limits equal to those most recently in effect prior to the date of termination, or enter into such other arrangements as shall reasonably assure Plan of the maintenance of coverage applicable to the claims arising during the period in which this Agreement was in effect for a period of not less than five (5) years after the effective date of termination hereof.

10.4    Proof of Insurance. Hospital shall ensure that its professional liability carrier provides Plan with evidence of the professional liability coverage required by this Agreement, and notifies Plan at least thirty (30) days prior to the termination, cancellation or lapse of such coverage.

## ARTICLE XI.
## PLAN MEMBER COMPLAINTS AND DISPUTES

11.1    Notice of Complaint. If Hospital receives any material complaint regarding Hospital in connection with this Agreement, Hospital shall notify Plan within three (3) days of receipt thereof of all details of such complaint. In the event Plan receives a complaint regarding Hospital in connection with this Agreement, Plan shall notify Hospital of such complaint within three (3) days of receipt thereof.

11.2    Cooperation with Grievance and Appeals. Hospital agrees to make commercially reasonable efforts to cooperate with the grievance and appeal procedures described in the Provider Services Manual for review and resolution of Plan Medicare Member clinical and non-clinical grievances and provider grievances, as established by the Plan and approved by CMS.

11.3    Administrative Hearing. In the event any complaint or grievance of a Plan Medicare Member cannot be settled through the such procedures, the matter may be submitted to the appeals and grievances processes specified in Medicare regulations. Hospital agrees to cooperate with and, when necessary, participate in any such processes and be bound by the determinations of such processes.

## ARTICLE XII.
## DISPUTE RESOLUTION

12.1    Dispute Resolution. Controversies between Hospital and Plan shall be resolved, to the extent possible, by informal meetings or discussions between appropriate representatives of the parties. Either party must submit a Notice of Dispute stating the nature of the dispute, the party's position, and requested remediation

in writing to the other party before arbitration in 12.2 can be initiated. The party receiving the notice has thirty (30) days to respond to the other party. If no written response is forthcoming, the initiating party may file for arbitration under Section 12.2 below. If a written response is sent, the parties have thirty (30) days to meet and confer, or otherwise attempt to settle the dispute. If the matter remains unresolved after the thirty (30) days, either party can file for arbitration under Section 12.2 below.

12.2    Arbitration. Any dispute, controversy, or disagreement arising out of or relating to this Agreement shall be settled exclusively by binding arbitration which shall be conducted in Los Angeles, California in accordance with the American Health Lawyers Association ("AHLA") Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and which to the extent of the subject matter of the arbitration, shall be binding not only on the parties to the Agreement, but on any other entity controlled by, in control of, or under common control with the party to the extent that such affiliate joins in the arbitration, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. It is agreed that the arbitrator shall be bound by applicable state and federal laws and that the arbitrator shall issue written findings of fact and conclusions of law. The arbitrator shall have no authority to award damages or provide a remedy that would not be available to such prevailing party in a court of law. Nothing herein shall prohibit a party from seeking equitable or declaratory relief in a court of law to maintain the status quo while arbitration is pending hereunder. The prevailing party as determined by the arbitrator shall not be entitled to recover from the non-prevailing party any or all reasonable costs, fees and expenses of the arbitration, including its actual attorneys' fees. In no event shall either party initiate arbitration prior to the conclusion of the provider dispute resolution procedures set forth in Section 12.1 or after the date when the institution of legal or equitable proceedings based on such dispute would be barred by the applicable statute of limitations."

## ARTICLE XIII.
## UNFORESEEN CIRCUMSTANCES

13.1    Force Majeure. For so long as any natural disaster, war, riot, civil insurrection, epidemic or any other emergency or similar event not within the control of Hospital results in the facilities or personnel of Hospital being unavailable to provide or arrange for the provision of Covered Hospital Services, Hospital shall only be required to make a good faith efforts to provide or arrange for the provision of such services, taking into account the impact of the event.

13.2    Force Majeure Termination. In the event the Covered Hospital Services that Hospital has agreed to provide are substantially interrupted pursuant to an event described above, Plan shall have the right to terminate this Agreement upon ten (10) days prior written notice to Hospital.

## ARTICLE XIV.
## GENERAL PROVISIONS

14.1    Assignment. Neither party shall assign this Agreement or delegate any of its obligations hereunder without first obtaining the written consent of the other party. To the extent required by CMS, any such assignment or delegation shall be void unless prior written approval of such assignment or delegation is obtained from CMS.

14.2    Notices. Any notice required or permitted to be given pursuant to the terms and provisions of this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, to Plan at:

**Carelst Health Plan**
601 Potrero Grande Drive
Monterey Park, CA 91755
Attn: Director, Provider Network Operations

or to Hospital at:

**St. Vincent Medical Center**

2131 W Third Street

Los Angeles, CA 90057

And

Vice President, Managed Care Contracting and Payor Relations
Daughters of Charity Health System
595 East Colorado Blvd., Suite 205
Pasadena, CA 91101

Notices shall be deemed effective upon receipt. Either party may at any time change its address for notification purposes by mailing or delivering a notice as required hereinabove stating the change and setting forth the new address. The new address shall be effective on the third day following the date such notice is received, unless a subsequent date of effectiveness is specified in said notice.

14.3    Severability. In the event any provision of this Agreement is rendered invalid or unenforceable by state or federal law or regulation, or declared null and void by any court of competent jurisdiction, the remainder of the provisions of this Agreement shall, subject to Section 14.4, remain in full force and effect.

14.4    Effect of Severability. In the event a provision of this Agreement is rendered invalid or unenforceable or declared null and void, as provided in Section 14.3, and its removal has the effect of materially altering the obligations of either party in such manner as, in the reasonable judgment of the party affected: (a) will cause serious financial hardship to such party; or (b) will cause such party to act in violation of its organizational documents, the party so affected shall have the right to terminate this Agreement upon thirty (30) days' prior written notice to the other party.

14.5    Integration of Entire Agreement. Both Parties agree and understand that this Agreement including the Recitals and all Attachments references in this Agreement and attached hereto and incorporated herein supersede any and all prior Agreements respecting the Parties' rights and obligations.

14.6    Amendment. This Agreement may be amended at any time during the term of this Agreement by the mutual written consent of the parties. Amendments shall comply with the Act and the Regulations. Proposed changes that require prior regulatory or other approval shall become effective upon receipt by Plan of notice of such approval so long as the provision is incorporated by reference as a citation of law. Additionally, this Agreement may be amended by Plan to the extent required by CMS or DMHC to ensure that the terms of this Agreement comply with the provisions of the Acts and Regulations.

14.7    Headings. The headings of the Articles and Sections contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

14.8    Conflict of Interest. Hospital warrants that no part of the total compensation provided herein shall be paid directly or indirectly to any officer or employee of the State of California as wages, compensation, or gifts in exchange for acting as an officer, agent, employee, subcontractor, or consultant to Hospital in connection with any work contemplated or performed relative to this Agreement. Hospital certifies that

no member of or delegate of Congress, the General Accounting Office, HCFA, or any other Federal agency has or will benefit financially or materially from this Agreement.

14.9    Waiver of Breach. The waiver of any breach of this Agreement by either party shall not constitute a continuing waiver of any subsequent breach of either the same or any other provision of this Agreement.

14.10    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California or federal law as applicable.

14.11    Religious Directives: Plan acknowledges that Facility is an institution operated in accordance with the Ethical and Religious Directives for Catholic Health Services ("The Directives"). Notwithstanding any provision of this agreement to the contrary, Facility shall not be required, nor shall and provision of this agreement be construed to require, Facility to provide services, pay for or authorize services, or otherwise participate in activities that are not consistent with The Directives. A copy of The Directives is available at http://www.usccb.org/bishops/directives.shtml.

IN WITNESS WHEREOF, the parties have duly executed this Agreement effective as of the day and year first above written.

| Care1st Health Plan "Plan" | St. Vincent Medical Center "Hospital" |
|---|---|
| By: | By: |
| Name:    Anna Tran | Name:    Cathy Fickes |
| Title:    CEO | Title:    President / CEO |
| Date:    5/3/2013 | Date    2/26/13 |